United States Court of Appeals,

Eleventh Circuit.

No. 93-9426.

UNITED STATES of America, Plaintiff-Appellee, Cross-Appellant,

v.

David GRIGSBY, Doris Grigsby, Defendants-Appellants, Cross-Appellees.

May 2, 1997.

Appeals from the United States District Court for the Northern District of Georgia. (No. 1:93-CR-6-2-ODE), Orinda D. Evans, Judge.

Before BIRCH, Circuit Judge, and KRAVITCH and HENDERSON, Senior Circuit Judges.

BIRCH, Circuit Judge:

These appeals from convictions for conspiracy to import raw African elephant ivory in violation of the African Elephant Conservation Act ("AECA"), 16 U.S.C. § 4223(1), violations of the Endangered Species Act of 1973, 16 U.S.C. § 1538(c)(1), and the Migratory Bird Treaty Act, 16 U.S.C. §§ 703 and 707(a), challenge the jury instructions as being erroneous and incomplete with respect to the AECA, and the verdicts regarding the other wildlife statutes as being contrary to the evidence and jury instructions. The district court instructed that general intent was all that was required to violate the AECA, omitted relevant exceptions to that statute, and instructed that the household effects exception applied to all of the statutes. Because we conclude that the district court's AECA jury instructions were erroneous and incomplete and that the jury's verdicts as to the other wildlife statutes were contrary to the jury instructions and evidence, we REVERSE and REMAND with instructions to grant the motions for

judgments of acquittal.

## I. BACKGROUND

In 1978, defendants-appellants David and Doris Grigsby, husband and wife and United States citizens, moved from Ohio to Stittsville, Ontario, Canada, and began operating a taxidermy business. David, a professional taxidermist, performed the taxidermy work, and Doris, who has a high school education, handled the business aspects. In 1987, one of their customers, R.W. Ashton, asked them to sell his sport-hunted trophies, including nine elephant tusks brought into Canada from several African safaris between 1965 and 1973.[1] Illinois resident Kenneth Enright, who owned a company that manufactured cutlery, archery, and pistol handles from ivory, responded to the Grigsbys' advertisement in June, 1988. After negotiating with the Grigsbys from June through October, 1988, Enright agreed on a price of fifty United States dollars ($50) per pound for the ivory tusks.

Before traveling to Canada to view the ivory, Enright asked Doris Grigsby to inquire about Canadian export permits. Since she had no previous experience with export documents, Doris contacted Gordon Shearer, the District Conservation Officer Coordinator of the Ontario Office of the Interior Ministry of Natural Resources, who issued export permits under the Convention on International Trade in Endangered Species of Wild Fauna and Flora, Mar. 3, 1973, 27 U.S.T. 1087, T.I.A.S. No. 8249 (entered into force July 1, 1975)

---

[1]The elephant tusks averaged fifty to sixty pounds and were fifty to sixty inches long.

[hereinafter "CITES" or "Convention"][2] and who had known the Grigsbys since their arrival in Canada. Shearer testified that he remembered receiving Doris Grigsby's inquiry concerning the export permits, but that he had never issued export permits for African elephant ivory and was unfamiliar with the process.

Ashton transferred the original certificates of ownership for two of the ivory tusks. The Canadian Wildlife Service was satisfied that, because the harvesting was before applicability of CITES, a permit could be issued for all of the ivory tusks. After Doris Grigsby applied for the original eight African elephant tusks, a Canadian export CITES permit was issued on October 20, 1988. She informed Enright by telephone on October 24, 1988, that the CITES export permit had been issued.

Enright arrived in Canada to purchase the ivory tusks on November 8, 1988. He brought a completed, certified check for twenty-six thousand United States dollars ($26,000) drawn on the account of his Illinois company and payable to Grigsby Taxidermy. Enright then learned that an additional ivory tusk had been added for sale by Ashton, making a total of nine tusks available for sale. After examining the tusks and determining that the quality of the ivory did not meet his expectation, Enright negotiated directly with Ashton to reduce the sales price from fifty to forty United States dollars ($50-$40) per pound.

Upon consummation of the sale with Ashton, Enright tendered to

---

[2]The purpose of CITES, 27 U.S.T. 1087, T.I.A.S. No. 8249, an international treaty to which the United States is a signatory, is to protect certain species of fish and wildlife from exploitation.

Doris Grigsby the completed certified check.  Since the check was payable to Grigsby Taxidermy instead of Ashton and exceeded the final sales price, Doris Grigsby took Enright to her Canadian bank, where the certified check was converted to a Canadian bank draft payable to Ashton in Canadian funds, with Enright retaining the difference.  Doris Grigsby gave Enright a receipt for the purchase of the ivory in the amount of twenty thousand, five hundred ninety-four Canadian dollars ($20,594), the dollar amount of the Canadian bank draft payable to Ashton.

Following this bank transaction, when the United States funds were converted to Canadian funds, Enright told Doris Grigsby for the first time that his plans had changed and that he no longer wanted the ivory shipped to the United States but instead to a subsidiary company in Hong Kong. He explained that the United States recently had enacted the AECA, which prohibited the importation of African elephant ivory from nonivory producing countries, including Canada.[3]

Enright asked Doris Grigsby to return to the Canadian Ministry to obtain a CITES permit for Hong Kong. He gave her his company mailing label, pretyped to the address of George Wong, an ivory broker in Hong Kong, for shipment of the ivory tusks that Enright had purchased.  Accommodating Enright's request, Doris Grigsby telephoned Shearer at the Canadian Interior Ministry of Natural Resources and advised him that the plans had changed necessitating a CITES permit for Hong Kong and the addition of the ninth tusk.

---

[3]The AECA was signed into law by President Reagan on October 7, 1988, but the relevant ivory moratorium did not become effective until June 9, 1989.  54 Fed.Reg. 24,758 (1989).

Shearer testified that Doris Grigsby told him that she had just learned of the change in the United States law precluding taking the shipment into the United States, although she had a Canadian permit for it. A second CITES permit was issued on November 8, 1988, for the nine ivory tusks to be exported to Hong Kong.

When Doris Grigsby obtained the CITES permit from Shearer's office on November 8, 1988, she noticed and took a free Fish & Wildlife "Facts" sheet printed by the Fish and Wildlife Service of the United States Department of the Interior. This document specifically addressed ivory and contained information concerning the importation of noncommercial shipments of ivory. In pertinent part, the Facts sheet stated:

2. African elephant (*Loxodonta africana* ).

....

A. Non-commercial shipments. Raw and worked ivory may be imported and reexported *for personal use (accompanying personal baggage) without CITES documents.*

*Ivory,* Fish and Wildlife Facts (Fish & Wildlife Serv., U.S. Dept. of the Interior, Washington, D.C.), Jan. 1988 (Defendant's Exhibit No. 20) (emphasis added).

When Doris Grigsby returned to her home after obtaining the CITES permit, Enright had crated the ivory tusks. For the additional trouble in returning to Shearer's office a second time, Enright offered the Grigsbys five hundred United States dollars ($500). The crated ivory tusks filled one entire side of the Grigsbys' carport. Following his meeting with David and Doris Grigsby in November, 1988, Enright's subsequent contacts were with Doris Grigsby only. Ashton died following this sale of the ivory

tusks to Enright.

After the crates had been in the Grigsbys' carport for two weeks, Doris Grigsby called Enright in Illinois to inquire why the ivory had not been removed.  He informed her that his plans to sell the ivory tusks in Hong Kong had not materialized.  Doris Grigsby then told Enright that she would charge him one hundred United States dollars ($100) per month as a storage fee for each month that the ivory tusks remained on the Grigsbys' property after the December 20, 1988, expiration date for the CITES permit to Hong Kong.

The Grigsbys did not hear from Enright regarding his twenty thousand United States dollar ($20,000) investment until July, 1989, ten months after his purchase.  He authorized the Grigsbys to sell the ivory tusks in Canada for him.  Enright further wanted the Grigsbys to resell his ivory for his preferred selling price of sixty-five United States dollars ($65), but not less than fifty United States dollars ($50) per pound.  After advertising the ivory tusks for sale, Doris Grigsby sold two ivory tusks.  On August 14, 1989, she sent Enright a bank draft for four thousand Canadian dollars ($4,000) for the two sales and added two thousand Canadian dollars ($2,000) of her own without retaining her ten percent sales commission to which Enright previously had agreed.  Nevertheless, Enright neither attempted to obtain the ivory tusks for which he had paid nor compensated the Grigsbys any storage fees during 1990.  Consequently, the ivory tusks were stored in the Grigsbys' carport in Canada from November, 1988, until 1991.

In the summer of 1991, the deteriorating health of David

Grigsby, who suffered from degenerative arthritis, necessitated their return to the United States for a warmer climate. They moved temporarily to Toccoa, Georgia. The ivory tusks, however, remained in Canada at their residence there. In March, 1992, Doris Grigsby called Enright to inform him that she would be in Canada in June and July, 1992, for the family's final move to the United States. She beseeched Enright to pay the outstanding storage fees for four years of storing the ivory tusks and to obtain the ivory.

Doris Grigsby did not hear from Enright in June or July, 1992. Instead, she heard from a stranger, Alan Zanotti, a former used car repossesser, who informed her that he had purchased the ivory from Enright, and that he was going to confiscate it. By July 31, 1992, Doris Grigsby had received no communication from Enright confirming Zanotti's information. Accordingly, she claimed ownership because she believed that Enright had abandoned the ivory and that it had reverted to her in satisfaction of the four years of past due storage fees.

Enright finally contacted the Grigsbys and advised them that he wanted to travel to Canada at the end of August or September to obtain the ivory. This was unacceptable to the Grigsbys, who needed to be in Georgia by that time to enroll their son in school. Doris Grigsby further informed Enright that the ivory tusks were packed in a moving van and were inaccessible. Enright reiterated to the Grigsbys that it would be illegal to bring the ivory into the United States. He also contacted the United States Fish and Wildlife Service to report the imminent, allegedly illegal importation of the ivory tusks.

The Grigsbys received two telephone calls from Zanotti to warn them that someone was on the way to repossess the ivory tusks. Suspecting trouble or possible violence and because the moving van could not be closed or locked, Doris Grigsby decided to store the ivory across the border, where it could be obtained on their way to Georgia. Doris Grigsby, her son, and Kathy Rye, a neighbor's daughter,[4] took the ivory tusks into the United States at Ogdensburg, New York, where they moved the ivory into a miniwarehouse. Doris Grigsby signed all rental documents in her name.

The Grigsbys did not obtain export or import permits for their move from Canada to the United States. They relied on their permits of ownership, which were trial exhibits, and the Fish and Wildlife Service, Department of the Interior Facts sheet on ivory, which stated that all wildlife could be moved with personal belongings for a noncommercial purpose. Among their personal, household effects moved by a private moving service were harp seal, black and polar bear skins as well as certain migratory birds, including a barred owl, saw whet owl, kestrel, and goshawk. At United States Customs, the van driver wrote on the form "household effects," and no search of the van was conducted. The Grigsbys

---

[4]Kathy Rye was eleven years old at the time that these events occurred. Her father, Tim Rye, had helped load the ivory tusks into the Grigsby's minivan. Kathy Rye, who was twelve at the time of trial, testified that Doris Grigsby told her to put her blanket and pillow over the ivory tusks and to lie there. She also testified that, when the minivan stopped at United States Customs, Doris Grigsby said that she had a little girl sleeping in the back of the van. Tim Rye testified that Doris Grigsby said that she did not want to be "stuck at Customs with paperwork." R11-264. Both Tim and Kathy Rye were granted governmental immunity.

contend that they believed that it was lawful to move the ivory tusks with the other wildlife that they owned and possessed for their personal use as personal household belongings, since these possessions were being taken into the United States for a noncommercial purpose. Doris Grigsby testified at trial that, when she brought the ivory and other personal wildlife into the United States, she did not intend to violate any law. At trial, government witness, Dr. Robert R. Campbell of the CITES Management Authority of Canada, testified that, in August, 1992, the African elephant, threatened with extinction, was a CITES Appendix I, protected species. He also testified that Canada issued permits for the noncommercial export of African elephant specimens to the United States upon proof that the items were either pre-Convention or a personal effect that had been in possession of the applicant for a number of years.

By mid August, 1992, the Grigsbys had completed their move to Toccoa, Georgia, including the ivory tusks. In late September, 1992, Doris Grigsby learned that Enright had telephoned Canada to locate her. In response and to get his attention, Doris Grigsby wrote Enright a letter dated September 30, 1992, which stated that he could have the ivory for twenty-six thousand, five hundred United States dollars ($26,500). Enright, cooperating with agents of the Fish and Wildlife Service, specifically Special Fish and Wildlife Agent John Decker, testified that he engaged the Grigsbys in a series of telephone conversations and written correspondence concerning disposition of the ivory tusks. After involved negotiations, Enright counteroffered eight thousand United States

dollars ($8,000) in a letter dated November 18, 1992. He calculated this amount as five thousand United States dollars ($5,000) for the ivory, computing one hundred United States dollars ($100) per month storage for four years and two months and three thousand United States dollars ($3,000) for delivery. Doris Grigsby's final offer was ten thousand United States dollars ($10,000).

Following additional written negotiations, Doris Grigsby agreed to ship Enright one ivory tusk for two thousand United States dollars ($2,000), cash on delivery. This shipment was intercepted by federal agents and returned to the Grigsby's home in Toccoa in an attempt to recover the remaining tusks. David Grigsby accepted the package and identified it as "ivory." R13-519-20.

Skeptical of Enright's trustworthiness regarding the protracted transaction, the Grigsbys loaded all of the remaining ivory tusks into a van to be shipped to Enright. Doris Grigsby was followed by federal and state wildlife agents. Suspecting that she was being followed by Zanotti, Doris Grigsby stopped at a local bait store, where she was arrested. A search of the minivan revealed the six ivory tusks.

A subsequent search of the Grigsbys' Toccoa residence disclosed the other wildlife items, including the harp seal, polar and black bear skins and the migratory birds. Decker, who was involved in the search of the Grigsby residence and arrest of David Grigsby on December 17, 1992, testified that David Grigsby admitted repackaging the returned tusk and wrapping three other tusks in preparation for shipment to Enright. While David Grigsby told

Decker that he knew that Enright had represented that he could not bring the tusks into the United States because of a "change in the law," *id.* at 609, he also maintained to Decker that the tusks belonged to the Grigsbys because Enright failed to pay the storage costs for the tusks, while the Grigsbys stored the tusks in Canada. Although his agency generally requires a written waiver when interviewing a suspect, Decker testified that he did not obtain a written waiver from David Grigsby before questioning him "because I didn't have a waiver form with me," *id.* at 603, even though Decker was involved directly in investigating the Grigsbys for two months prior to the search of the Grigsby residence and arrest of David Grigsby. On cross-examination, Decker acknowledged that he did not record his questioning of David Grigsby, that he did not prepare a summary of David Grigsby's purported statements for him to review and sign, and that he did not ask David Grigsby to prepare a written summary of his comments for Decker.

David and Doris Grigsby were charged in a superseding indictment on five separate counts: (1) conspiracy to import endangered species of wildlife, 18 U.S.C. §§ 371 and 545; (2) violation of the AECA, 16 U.S.C. § 4223(1); (3) violation of the Lacey Act, 16 U.S.C. §§ 3372(a)(1), (a)(4) and 3373(d)(1)(B); (4) unlawful importation of endangered species, 18 U.S.C. § 545; and (5) violation of the Migratory Bird Treaty Act, 16 U.S.C. §§ 703 and 707(a). At the conclusion of the government's case, counsel for David Grigsby moved for judgment of acquittal on all five counts of the superseding indictment under Rule 29 of the Federal Rules of Criminal Procedure. The district judge denied this motion

because she believed that the Grigsbys were aware of export/import law because of their taxidermy business. During discussion regarding admissibility of certain government evidence, the assistant United States attorney conceded that much of the evidence will relate to actions and statements of Doris Grigsby, and that "[t]here isn't much, nearly as much evidence against David Grigsby." R10-7. Doris Grigsby testified at trial; David Grigsby did not testify. At the end of all of the evidence and a renewed Rule 29 motion, the district judge granted a judgment of acquittal on violation of the Lacey Act and dismissed Count Three of the indictment.

The transcript of the charge conference reveals that the district judge, the government attorney, and counsel for the defendants grappled with the proper jury instructions to give for the violation of the AECA because there were no federal cases interpreting this statute. They discussed whether the sport-hunted trophies and pre-Convention harvest exceptions applied to the AECA violation as well as whether the household effects exception was applicable to the wildlife brought into the United States. The assistant United States attorney consulted with Decker of the Fish and Wildlife Service to answer the judge's question concerning the residency, as opposed to citizenship, requirements of 50 C.F.R. § 23.13(d). R15-1066, 1072. The district judge expressed exasperation throughout the charge conference with counsels' inability to provide her with statutory and regulatory interpretive

assistance.[5]  When she instructed the jury, the district judge explained that "[t]his case is unusually difficult on the law, and all these times that you have been kept waiting in the jury room are times wh[en] we have been wrestling with the legal issues in this case."  *Id.* at 1081.

The district judge then instructed the jury that violation of

---

[5]Examples of the judge's frustration with counsels' interpretive assistance occur throughout the charge conference:

> THE COURT:  You know, to tell you the truth, I'm just about out of patience.  I know that this case is technically a difficult case, but, quite frankly, I'm frustrated that more of the work on these difficult issues has not been done outside this courtroom.

R15-984.

> THE COURT:  You didn't answer the question I'm asking, though.  I'm look[ing] still at this CFR exception in 23.13(d) and asking you why that exception doesn't apply to the permit requirements, the import permit requirement for the tusks, and the export permit requirement for the bearskins?

*Id.* at 1070.

> THE COURT:  What does the term accompanying personal baggage mean?

*Id.* at 1072.

> THE COURT:  That's the whole purpose of an exception, though.  That [explanation by Agent Decker that an exception cannot defeat the purpose of a law] doesn't make any sense.

*Id.* at 1075.

> THE COURT:  Now, we need to move ahead with this.  My patience is exhausted.
>
> Regarding this requirement of the Fish and Wildlife Declaration Form, what is supposed to be done with this form?  Is it supposed to be presented at Customs?

*Id.* at 1076.

the AECA required general intent and did not give any instructions regarding the sport-hunted trophies or pre-Convention exceptions to the statute. The judge also instructed that a household effects exception applied to all of the statutes governing the importation into the United States of wildlife not intended for sale. The jury convicted David and Doris Grigsby on all four remaining counts of the superseding indictment.

Doris Grigsby was sentenced to five months of imprisonment,[6] which is to be followed by three years of supervised release, the first five months of which shall be home detention. David Grigsby was sentenced to five years of probation. David and Doris Grigsby individually were fined a special assessment of $150 for each count of conviction and jointly were ordered to pay Enright, the owner of the ivory tusks, restitution of $12,000 for the unlawful importation of the tusks from Canada. The Grigsbys appeal their respective convictions and sentences. They also challenge the district court's denial of their motions for judgments of acquittal. Because we reverse their convictions, we address only the jury instructions for the statutes under which David and Doris Grigsby were convicted and need not discuss their evidentiary and sentencing issues raised on appeal.

## II. ANALYSIS

A. *Review of Jury Instructions*

"We review jury instructions *de novo* to determine whether

---

[6]Doris Grigsby was sentenced to five months of imprisonment on each of the four counts under which she was convicted, the terms to be served concurrently. She has not served her imprisonment term pending appeal.

they misstate the law or mislead the jury to the prejudice of the objecting party." *United States v. Chandler,* 996 F.2d 1073, 1085 (11th Cir.1993), *cert. denied,* 512 U.S. 1227, 114 S.Ct. 2724, 129 L.Ed.2d 848 (1994). Counsel's objections to proposed instructions "should be sufficient to give the district court the chance to correct errors before the case goes to the jury." *United States v. Sirang,* 70 F.3d 588, 594 (11th Cir.1995); *see* Fed.R.Crim.P. 30. A district judge's "refusal to give a requested jury instruction is reviewed for abuse of discretion," because " "[a] defendant is entitled to have the court instruct the jury on the theory of the defense, as long as it has some basis in the evidence and has legal support.' " *United States v. Morris,* 20 F.3d 1111, 1114-15 (11th Cir.1994) (quoting *United States v. Orr,* 825 F.2d 1537, 1542 (11th Cir.1987)).[7] We reverse when "we are left with "a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations.' " *Mark Seitman & Assocs. v. R.J. Reynolds Tobacco Co.,* 837 F.2d 1527, 1531 (11th Cir.1988) (quoting *Johnson v. Bryant,* 671 F.2d 1276, 1280 (11th Cir.1982)).

B. *CITES: Implementing and Interrelating Legislation*

CITES, which entered into force on July 1, 1975, resulted from the recognition by the signatory countries "that international cooperation is essential for the protection of certain species of wild fauna and flora against over-exploitation through international trade." CITES, 27 U.S.T. at 1090 (proclamation of

---

[7]Furthermore, we have held: "There is no need to object to a court's specific denial of a request for a jury instruction. The presentation of the request and its denial [are] sufficient to preserve the issue for appeal." *Morris,* 20 F.3d at 1114 n. 3.

the contracting states).  The United States and Canada are CITES signatories.  CITES, 27 U.S.T. at 1346, 1349 (signatories to CITES), 50 C.F.R. § 23.4 (1992).  CITES establishes a "regulatory system" that "monitors the trade in wildlife, both flora and fauna, passing through one member country to another." *United States v. Stubbs,* 11 F.3d 632, 637 (6th Cir.1993).  With respect to protected wildlife, such as that at issue in this case, "[t]he local authorities, within the various signatory countries to CITES, must know how many animals are being exported, in order to protect the listed species from exploitation." *United States v. 3,210 Crusted Sides of Caiman Crocodilus Yacare,* 636 F.Supp. 1281, 1287 (S.D.Fla.1986).

CITES classifies protected species according to the extent to which they are endangered in appendices.  Appendix I lists "all species threatened with extinction which are or may be affected by trade," and Appendix II includes "all species which although not necessarily now threatened with extinction may become so unless trade in specimens of such species is subject to strict regulation in order to avoid utilization incompatible with their survival." CITES, art.  II, paras. 1, 2(a), 27 U.S.T. at 1092.  Article VIII of CITES requires each signatory country to enact laws to effectuate the treaty.  CITES, art.  VIII, 27 U.S.T. at 1101.

The African elephant, *Loxodonta africana,* initially protected in the United States by the Endangered Species Act of 1973,[8] which,

---

[8]The United States first implemented CITES through the Endangered Species Act of 1973.  *See* 16 U.S.C. § 1531(b) ("The purposes of [the Endangered Species Act] are to provide a ... program for the conservation of such endangered species and threatened species, and to take such steps as may be appropriate

as amended, implemented CITES and utilized its appendices, was listed on CITES Appendix II on February 4, 1977, and upgraded to Appendix I in 1990. 50 C.F.R. § 23.23 (1989); 50 C.F.R. § 23.23 (1990). On October 7, 1988, Congress enacted Public Law No. 100-478, a two-part wildlife conservation amendment to the Endangered Species Act of 1973: Title I is the Endangered Species Act of 1988, and Title II is the AECA. Endangered Species Act of 1988, Pub.L. No. 100-478, 102 Stat. 2306 (codified as amended at 16 U.S.C. §§ 1531-1533, 1535, 1538-1540, 1542, 1544 (1988)); AECA, Pub.L. No. 100-478, 102 Stat. 2315 (codified at 16 U.S.C. §§ 1538, 4201, 4203, 4211-4213, 4221-4225, 4241-4245 (1988)). Both the Endangered Species Act of 1973, which includes the birds protected by the Migratory Bird Treaty Act, *see* 16 U.S.C. § 1531(a)(4), and the AECA use the CITES appendices and seek to implement the goals of CITES. *See* 16 U.S.C. § 4241 (stating that the AECA supplements the Endangered Species Act of 1973).

The AECA further implemented CITES with respect to the African elephant. *See* 16 U.S.C. §§ 4223, 4242-44. The legislative history for the AECA confirms that Congress determined that additional legislation was necessary to protect the African elephant because the CITES system for controlling ivory consumption had been insufficient to prevent lucrative, unlawful poaching, which would result in the extinction of the African elephant if the

---

to achieve the purposes of the treaties and conventions set forth in subsection (a) of this section[, including CITES].");
*Tennessee Valley Auth. v. Hill,* 437 U.S. 153, 184, 98 S.Ct. 2279, 2297, 57 L.Ed.2d 117 (1978) ("The plain intent of Congress in enacting [the Endangered Species Act] was to halt and reverse the trend toward species extinction, whatever the cost.").

then-current rate of slaughter continued.[9]  To achieve this end and

---

[9]In support of the original bill, which ultimately was enacted as the AECA, Congressman Beilenson, who introduced H.R. 2999, explained:

> Some people argue that the elephants belong to Africa, and that, ultimately, it will be up to the countries there to determine whether or not the elephant will survive.  However, it has become apparent that even the best-intentioned and uncorrupted African governments are limited in their ability to control poachers because, like the drug trade, there is enormous profit to be made from ivory.  For that reason, I believe very strongly that the United States, and other ivory consuming nations, can and must play a bigger role in restricting the ivory trade.

> In 1985, the parties to the Convention on International Trade in Endangered Species [CITES], which is the international governmental organization charged with regulating wildlife trade, took a first step toward addressing the plight of the African elephant.  Together, the ivory-producing nations and the ivory-consuming nations—including the United States—agreed to a system which would limit the taking of elephants, and track individual tusks, in an effort to ensure that illegally poached ivory could not be sold on the world market.

> Unfortunately, this system, while well-intentioned, has been unsuccessful so far in eliminating the illegal trade because it has not been aggressively enforced by those countries, such as the United States, which import ivory.  Our legislation will provide the mechanisms necessary to enforce that system at our borders, and it will encourage other ivory-consuming nations to do the same.

> Like gold and silver, ivory is a commodity used to hedge against inflation.  As the price of ivory rises, more elephants are slaughtered.  As more elephants are killed, the increased fear that the supply will run out drives the price of ivory up even more.  The elephant has thus become a most unfortunate victim of a vicious upward spiral of supply and demand.  In 1960, ivory sold for $2.25 per pound;  the going rate is now about $68 per pound.  With a single large tusk worth more than $5,000 retail on the world market, and the average per capita income at $300, an African poacher can earn much more for himself and his family by killing one elephant than by farming for 1 year, an enormously powerful incentive to kill elephants that will not

to adhere to the CITES control of ivory trade, the ACEA established

moratoria provisions. 16 U.S.C. §§ 4221-4225. Several ivory

moratoria have been implemented in the United States pursuant to

the AECA.[10] The latest moratorium, relevant for this case, precluded

the importation of raw and worked ivory from all ivory producing

and intermediary[11] countries effective June 9, 1989.[12] 54 Fed.Reg.

---

> disappear until we can reduce the value of ivory by
> cutting demand.
>
> ....
>
> The elephant simply will not survive another
> decade if the current rate of killing continues. As a
> major importer of carved ivory, we in the United States
> can—and indeed must—play a role in seeing that the
> demand for expensive ivory carvings, trinkets, and
> jewelry is not permitted to continue at such an
> uncontrolled rate, and at the expense of a truly unique
> and beautiful species.

134 Cong. Rec. 21,012, 21,013 (1988) (statement of Rep.
Beilenson).

[10]The following moratoria on raw and worked ivory imports
into the United States have been implemented pursuant to the
AECA: (1) on December 27, 1988, a moratorium was placed on all
ivory imports from countries which are not parties to CITES, 53
Fed.Reg. 52,242 (1988); (2) on February 24, 1989, a moratorium
was placed on all ivory imports from Somalia, 54 Fed.Reg. 8008
(1989); (3) on June 9, 1989, a moratorium was placed on all
ivory imports from all ivory producing and intermediary
countries, 54 Fed.Reg. 24,758 (1989).

[11]The AECA defines a nonivory producing country, like the
United States or Canada, as an " "intermediary country,' "
meaning "a country that exports raw or worked ivory that does not
originate in that country." 16 U.S.C. § 4244(6); see 54
Fed.Reg. 24,761 (1989) (stating that the United States is an
"intermediary nation").

[12]The purpose in delaying establishing the effective date
for this moratorium was to permit transit time for ivory
shipments in progress between Africa and intermediary countries.
H.R. Conf. Rep. No. 928, 100th Cong., 2d Sess., tit. II, at 29
(1988), U.S.Code Cong. & Admin.News 1988, at 2700, 2747
(Endangered Species Act Amendments of 1988, the AECA). "The
intent is to allow for the proverbial "slow boat to China.' "

24,758 (1989).  Since the AECA is part of the Endangered Species Act of 1973, as amended, the federal regulations that implement and govern that statute as well as CITES also control the AECA.[13]

C. *AECA*

1. *Requisite Intent for Violation*

We review a district court's interpretation and application of a statute *de novo.  International Union v. Jim Walter Resources, Inc.,* 6 F.3d 722, 724 (11th Cir.1993).  When statutory language is clear and unambiguous, it controls interpretation " *absent a legislative intent to the contrary." Chandler,* 996 F.2d at 1084 (citing *United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981)) (emphasis added).  We resort to legislative history when the statutory language is unclear. *United States v. Rojas-Contreras,* 474 U.S. 231, 235, 106 S.Ct. 555, 557, 88 L.Ed.2d 537 (1985).  "Our objective when interpreting a statute is to determine the drafters' intent." *United States v. Castro,* 829 F.2d 1038, 1049 (11th Cir.1987), *modified on other grounds,* 837 F.2d 441 (11th Cir.1988).  Under these guiding interpretive principles, we must examine the statutory language of the AECA to determine if the district judge properly instructed the jury as to its application given the facts in this case.

Regarding the prohibited importation act at issue, the AECA states:  "Except as provided in section 4222(e) [the sport-hunted

---

*Id.*

[13]Under 50 C.F.R. pt. 23, "Endangered Species Convention," are the federal regulations implementing CITES. *See* 50 C.F.R. § 23.1(a) (1992) ("The regulations in this part implement the Convention on International Trade in Endangered Species of Wild Fauna and Flora, TIAS 8249.").

trophies exception] of this title, it is unlawful for any person --- to import raw ivory from any country other than an ivory producing country." 16 U.S.C. § 4223(1). The AECA provides both criminal and civil penalties. 16 U.S.C. §§ 4224(a) & (b). This case was prosecuted criminally, and it is that statutory penalty provision that has caused the interpretive determination of the requisite intent: "Whoever *knowingly violates* section 4223 of this title shall, upon conviction, be fined under Title 18, or imprisoned for not more than one year, or both."[14] 16 U.S.C. § 4224(a) (emphasis added).

Although the district judge tentatively had been inclined toward defense counsel's interpretation that "knowingly," as used in section 4224(a) with reference to section 4223(1) meant specific intent,[15] she reverted to her original interpretation, urged by the government, of general intent.[16] Thus, the district judge

---

[14]In contrast, the AECA civil penalty provides: "Whoever violates section 4223 of this title may be assessed a civil penalty by the Secretary of not more than $5,000 for each such violation." 16 U.S.C. § 4224(b).

[15]In leaning toward a specific intent interpretation for 16 U.S.C. § 4224(a), the district judge reasoned as follows:

> THE COURT: I'm tentatively inclined to think Mr. Brehm's [David Grigsby's counsel's] interpretation is correct. It is true that the word knowingly normally implies only that the act is volitional, but this statute is somewhat different from the norm in that it speaks of who[m]ever knowingly violates. It is different from what the result would be if section 4223 were to say that it is unlawful for any person to knowingly import raw ivory from any other country, et cetera.

R14-938.

[16]The district judge initially believed that "knowingly" in 16 U.S.C. § 4224(a) referred to general intent and, subsequently,

instructed the jury that violation of the AECA required only general intent:

> In order for a defendant to be found guilty of Count Two [AECA violation], the government must prove the following elements beyond a reasonable doubt.
>
> That the defendant either knowingly or fraudulently imported into the United States raw African elephant ivory.
>
> And secondly, that the importation was from a non-ivory producing country, in this case the country of Canada.
>
> The word knowingly means that an act is done voluntarily and intentionally, and not because of mistake or accident.[17]

returned to this view:

> THE COURT: And the definition of knowingly is that an act is done voluntarily and intentionally, and not because of mistake or accident.
>
> *There isn't a specific intent requirement in that act.* There is no requirement that the defendant's actions be done willfully; that is, with the specific intent to do something the law forbids; that is, with bad purpose either to disobey or disregard the law.
>
> So, the government's evidence would have to show a volitional act by the defendants.
>
> ....
>
> *Knowingly normally means volitional, general intent.*

R14-917, 936 (emphasis added). Throughout the discussions at the charge conference and in the proposed jury instructions, "knowingly" is construed to mean general intent, while "willfully" is interpreted to mean specific intent.

[17]The district judge essentially used the government's proposed Request to Charge No. 15 to instruct the jury on violation of the AECA:

> Title 16, United States Code, Section 4223(1) makes it unlawful to import raw ivory from any country other than an ivory producing country. In order for you to find the defendant guilty of Count Two of the indictment, the Government must prove the following elements beyond a reasonable doubt:

R15-1089-90.

Because no federal court had addressed whether "knowingly violates" in section 4224(a) requires general or specific intent, the district court was persuaded by the government's analogy to the Endangered Species Act, which contains similar language.[18] The Fifth Circuit and a district court in our circuit have found that general intent is sufficient to violate the Endangered Species Act. *United States v. Ivey,* 949 F.2d 759, 766 (5th Cir.1991), *cert. denied,* 506 U.S. 819, 113 S.Ct. 64, 121 L.Ed.2d 32 (1992); *United States v. Nguyen,* 916 F.2d 1016, 1018-20 (5th Cir.1990); *United States v. Billie,* 667 F.Supp. 1485, 1492-93 (S.D.Fla.1987). In denying Doris Grigsby's motion for a new trial, the district judge clarified that she had adopted this rationale in determining that general intent was required for violation of the AECA:

> The court finds the analogy to the Endangered Species Act persuasive, and agrees with the rationale of the Fifth Circuit cases and the *Billie* case. The pattern of the language in § 4224(a) of the African Elephant Conservation Act ("whoever knowingly violates") is identical to the language which has been interpreted not to require specific intent under the Endangered Species Act. The two acts are similar in purpose. Both criminal violations are misdemeanors. Accordingly, the court finds that the violation of § 4223(1) required only a finding of general intent and that the court properly charged the jury in this regard.

> (1) That the Defendant knowingly or fraudulently imported or brought into the United States raw African elephant ivory, *Loxodonta africana;* and

> (2) That the importation was from a non-ivory producing country, in this case Canada.

R4-78-15 (citing 16 U.S.C. §§ 4223(1) & 4224(a)).

[18]Under the Endangered Species Act, "[a]ny person who knowingly violates any provision" under that Act or any provision of any permit issued under the Act is subject to criminal prosecution. 16 U.S.C. § 1540(b)(1).

R3-115-10-11.

David and Doris Grigsby argue that, to be convicted under section 4224(a) of the AECA, the government must prove that the importer had specific knowledge of the AECA as well as knowledge that the specific, challenged conduct would be violative. David Grigsby sought this jury instruction in his Request to Charge No. 11:

> The African Elephant Conservation Act, 16 U.S.C. § 4223(1) and § 4224(a), makes it a violation of criminal law to knowingly import raw ivory from any country other than an ivory producing country. In order to prove a violation of this law as alleged in Count Two of the indictment, the government must prove beyond a reasonable doubt both of the following two elements:
>
> 1. That the defendant imported raw ivory from a country other than an ivory producing country as charged in the indictment; and
>
> 2. The defendant imported raw ivory *knowing that such importation was in violation of federal law.*

R4-74-11 (citing 16 U.S.C. §§ 4223(1) & 4224(a)) (emphasis added). This request to charge, which was adopted by Doris Grigsby, was rejected by the district judge.[19]  R15-957, 966.

_____

[19]The district judge also specifically refused to give David Grigsby's Request to Charge No. 15, which addresses knowledge of violating the AECA:

> The Defendant, David Grigsby, is accused of smuggling raw ivory into the United States. It is against federal law to smuggle raw ivory into the United States. For you to find David Grigsby guilty of this crime, you must be convinced that the government has proved each of these things beyond a reasonable doubt:
>
> First, that David Grigsby brought raw ivory into the United States.
>
> Second, that David Grigsby *knew the raw ivory should have been reported to customs authorities as required by law.*

Similarly, Doris Grigsby proposed jury instructions explaining that knowledge that the importation was unlawful was required for conviction in Request to Charge Nos. 17 and 20:

> Ladies and gentlemen of the jury, with respect to the charge alleging possession or concealment of smuggled goods, I charge you that the law "does not make the mere receipt or concealment of smuggled goods an offense. There must be, on the part of the person receiving or concealing the goods after their importation, *knowledge of their illegal importation* .... It has been uniformly held that "the jury was not authorized to convict unless the *possession or concealment of the goods was accompanied with knowledge on the part of the possessor that they had been smuggled or imported contrary to law.*' "

---

> Third, that David Grigsby, *intending to avoid the United States customs laws, did not report the raw ivory to the customs authorities.*

R4-74-15 (citing Federal Judicial Center, Pattern Criminal Jury Instructions No. 68 (1988)) (emphasis added). R15-966.

In discussing the knowledge/intent requirement with the district judge prior to the finalization of the jury instructions, David Grigsby's counsel explained his position:

> If you look at section 4223 of the Title 16 Act [AECA], that sets forth the acts themselves which are prohibited, and, of course, the charge in this case is subpart (1), which is to import raw ivory from any country other than an ivory producing country. That's the conduct that is prohibited, but then if you look at section 4224 right after that, that talks about penalties and enforcement, and subpart (a) is the criminal violation, and subpart (b) is civil.

> It would be our position as to David Grigsby that section 4224, subpart (a), the criminal violation, which says whoever knowingly violates section 4223, it is our position that that establishes a knowledge requirement which is a knowledge of the law itself.

R14-935. Despite this explanatory background and the district judge's comments that the evidence as to David Grigsby was "pretty thin" and "a little bit close in my mind," *id.* at 947, the judge did not give any instruction clearly delineating that knowledge of the AECA was required for its violation, which would demonstrate specific intent for criminal violation of the statute.

R4-77-17 (quoting *United States v. Sauer,* 73 F. 671, 677 (W.D.Tex.1896) (emphasis added)).

> Ladies and gentlemen of the jury, I charge you that you are not to presume the Defendants knew, or should have known, the sophisticated importation or customs laws of the United States just because they were in the taxidermist business in Canada.

*Id.* at 20 (citing *One Lot Emerald Cut Stones & One Ring v. United States,* 409 U.S. 232, 234 n. 4, 93 S.Ct. 489, 491 n. 4, 34 L.Ed.2d 438 (1972) (per curiam)). The district judge refused to give both of these proposed instructions. R15-978, 979. Thus, *there was no jury instruction that the government must prove that the importer actually knew that the specified importation violated the AECA.* After the jury charge, Doris Grigsby's counsel included in her objections to the charge the judge's giving government's Request to Charge No. 15 and not giving Doris Grigsby's Request to Charge Nos. 17 and 20 as well as David Grigsby's Request to Charge No. 11. R15-1100.

In the absence of federal case law interpreting the intent requirement of section 4224(a), and with conflicting interpretations advanced, we review the legislative history of this statute to ascertain if there is interpretive guidance as to the requisite intent for criminal violation of the statute.[20] The AECA was introduced in the House of Representatives on July 23, 1987, as House Bill 2999 ("H.R. 2999"). In this initial draft, under the Penalties and Enforcement section, civil penalties were provided

---

[20]We note that the legislative history that we address was before the district court in Doris Grigsby's supplemental brief supporting her motion for a new trial and request for time to file a reply brief. R3-111.

for "[a]ny person who *knowingly violates,* or who *knowingly commits* an act in the course of a commercial activity which violates, any provision of this Act." H.R. 2999, 100th Cong., 1st Sess. § 6(a)(1) (1987) (emphasis added).   The initial draft provided criminal penalties for "[a]ny person who *willfully commits* an act which violates any provision of this Act." *Id.* at § 6(b) (emphasis added).   Responding to the request for views on the proposed legislation, B. Wayne Vance, General Counsel of the United States Department of Transportation, emphasized the apparent interpretive confusion in the legislative description of the civil and criminal violative acts:

> Section 6(a)(1) (page 5, lines 23-4) creates civil penalties against a person who "knowingly violates" the bill, but section 6(b) (page 7, lines 18-9) creates criminal penalties against a person who "willfully commits an act" which violates the bill.   *If a distinction between "knowingly" and "willfully" is intended, it should be clarified in some way.*

African Elephant Conservation:  Hearing on H.R. 2999 and H.R. 4849 Before the Subcomm. on Fisheries and Wildlife Conservation and the Environment of the House Comm. on Merchant Marine and Fisheries, 100th Cong., 2d Sess. 64-65 (1988) (letter of B. Wayne Vance, General Counsel, U.S. Dept. of Transp.) (emphasis added).

In the final version of the AECA, codified at 16 U.S.C. § 4224(a), "[w]hoever *knowingly violates* section 4223," is subject to criminal penalties and "[w]hoever *violates* section 4223" is subject to civil penalties.  16 U.S.C. § 4224(a) & (b) (emphasis added). While "knowingly" is omitted from the codified civil penalties provision, it significantly is included in the criminal penalties provision.  Thus, in the final version of the statute, the adverb "knowingly" modifies the verb "violates" and connotes deliberate,

cognitive or specific intent as a requirement for criminal violation of section 4224(a).[21]

The Grigsbys acknowledge that the raw ivory was imported from a nonivory producing or intermediary country, Canada. They argue, however, that they did not have actual knowledge that this importation was in violation of United States law; consequently, they lacked specific intent to violate criminal section 4224(a) of the AECA. At the outset, we note that the importation into the United States of the ivory tusks in November, 1988, at the time of Enright's purchase from Ashton, would not have violated the AECA, since the applicable ivory moratorium for intermediary countries did not become effective until June 9, 1989. 54 Fed.Reg. 24,758, 24,761 (1989). It was Enright's apparent misunderstanding that the date of enactment, October 7, 1988, was the effective date of the applicable moratorium and his subsequent failure to obtain the tusks that he purchased from Ashton extending after the effective date of the moratorium that caused the predicament for the Grigsbys that became the basis of this case against them by the government.

The Grigsbys were not exporters/importers; they owned and

---

[21]While there is no modifying adverb in the final version of civil penalty section 4224(b), "knowingly" replaces "willfully" as the modifying adverb in the initial statutory draft of criminal penalty section 4224(a). This removal of "knowingly" from section 4224(b) and its replacement in section 4224(a) bolsters our view that violation of section 4223(1), resulting in criminal penalties, requires purposeful violation of section 4223(1). *See United States v. Miranda,* 835 F.2d 830, 832 (11th Cir.1988) (construing the definition of "knowingly" for criminal violation of the analogous Lacey Act, 16 U.S.C. § 3373(d)(1)(B), this court held that "*knowledge* [of offending the wildlife statute] is *necessary* to trigger a Lacey Act violation" (emphasis added)).

operated a Canadian taxidermy business.[22]  Most of their customers

appear to have been Canadian.  The evidence showed that they had

not dealt in ivory tusks, which are not the usual objects of a

taxidermist's trade, and that they undertook assisting their

customer Ashton in selling the tusks as an accommodation to him.

Clearly, Enright did not expect the Grigsbys to have export/import

knowledge or he would not have asked them to obtain this

information and to get the proper Canadian export documentation.

The district judge, however, believed that the Grigsbys were fully

cognizant of export/import law because of their experience in the

taxidermy business.   When David Grigsby's counsel moved for

acquittal on all counts under Rule 29 at the conclusion of the

government's case, the district judge stated:

> Let me say this:  I would love to be able to rule on these
> points now, but, quite frankly, the law is just too difficult.
> *I am concerned about the issue of specific intent.  If this
> were a case involving two people who don't deal in wildlife,
> I would throw all these charges out in a minute.*
>
> ....
>
> *[T]he thing that gives me pause is the fact that the Grigsbys
> are in the taxidermy business.   I haven't heard as much
> evidence relevant to Mr. Grigsby's intent as Mrs. Grigsby's,*
> but I think at this point the prudent thing to do is go ahead
> and deny the Rule 29 motions, and that's what I'm going to do.

---

[22]David Grigsby conducted taxidermy classes in Canada.  As part of that instruction, he advised that the proper permits were required for shipping certain wildlife within the Canadian provinces.  The record does not show that David Grigsby was knowledgeable regarding importation of wildlife into the United States.  With respect to the importation into the United States of the ivory tusks at issue in this case, the record reveals that neither David nor Doris Grigsby was aware of the United States requirements.  Thus, Doris Grigsby sought the advice of Gordon Shearer, the Canadian conservation official at the Ontario Office of the Interior Ministry of Natural Resources, who issued CITES export permits and who also was unaware of United States import requirements and regulations.

R13-681 (emphasis added).

The Grigsbys learned of United States law barring the importation of ivory when Enright informed them, albeit erroneously as to the effective date, upon his arrival in Canada presumably to consummate the purchase of the ivory tusks. When Doris Grigsby returned to the Canadian Ministry to obtain export documentation for Hong Kong at Enright's request, Shearer, whose job entailed knowledge of export/import laws, was unaware of the United States law that placed any moratoria on African elephant ivory. In contrast to Enright's verbal information concerning the United States elephant ivory moratoria law about which Shearer was not knowledgeable, Doris Grigsby saw and obtained the Facts sheet on ivory issued by the United States Department of the Interior Fish and Wildlife Service, while she was in Shearer's office on November 8, 1988. That publication specifically states that African elephant ivory may be imported into the United States without CITES documentation if it accompanies personal baggage. This official document affects the Grigsbys' knowledge and intent concerning moving the ivory tusks into the United States with their household goods.[23]

---

[23]Concerning her understanding of the information about noncommercially moving raw ivory into the United States with personal baggage that was conveyed by the United States Department of the Interior, Fish and Wildlife Service Facts sheet on ivory, Defendant's Exhibit 20, which is relevant to the Grigsby's subsequent importation, Doris Grigsby testified as follows:

    By Ms. Becker [Doris Grigsby's counsel]:

    Q. *Is this the Facts, F-a-c-t-s sheet,* or the top half *that you picked up at the U.S. Fish and Wildlife?*

A. *Yes, Ma'am.*

Q. Okay. It says at the top Fish and Wildlife, and United States Department of the Interior;  is that correct?

A. Yes.

Q. So, *you believed that to be the United States of America?*

A. *Oh, yes.*

Q. And *it obviously says ivory?*

A. *Correct.*

Q. And then it says elephants, and you came down to the African elephant;  correct?

A. Correct.

Q. Because *Mr. Ashton had indicated to you it was African elephant;  is that correct?*

A. *That's correct.*

Q. *Do you see here that it says the African elephant and its parts [are] regulated under Appendix [II]?*

A. *Yes.*

Q. And under paragraph (A) noncommmercial shipments?

A. Yes, Ma'am.

Q. *Does that Facts sheet advise that for noncommercial shipments, as long as African elephant ivory is being accompanied by personal baggage, you can export it—it actually says without CITES documents?*

A. *Yes, it says I can export without CITES documents.*

Q. Okay. So, you had that, and you just picked up all that stuff with you;  is that right?

A. That's correct.

Q. This is about November of 1988?

A. Correct.

It is the position of Doris Grigsby, who handled the protracted business contacts with Enright for four years, during which time she essentially begged him to remove the tusks from the Grigsbys carport for which service he had paid no storage fees, that Enright had abandoned the ivory tusks, which then became part of the Grigsbys' household baggage when they moved back to the United States. Doris Grigsby represents that the only reason that the ivory tusks were moved separately was because she feared personal harm from Zanotti, Enright's agent, whom she ostensibly believed had relinquished his claim of ownership in the tusks because of his failure to get them after four years and to pay her storage.[24] She used her name when she rented the locker in New York to store the tusks until the Grigsbys could retrieve them when they moved their household belongings to the United States.

Irrespective of whether this understanding of Doris Grigsby, who had a high school education, is correct, it does affect the Grigsbys' intent in moving the ivory tusks. If the Grigsbys truly believed that moving the ivory tusks across the border did not violate United States law based on specific information in the Department of the Interior Facts sheet on ivory, a trial exhibit,

---

R14-782-83 (emphasis added).

[24]We acknowledge that Doris Grigsby's continued communications with Enright in which she repeatedly requested that he obtain the ivory tusks as well as her selling two of the tusks in Canada and sending him the proceeds work against her argument that he had abandoned the tusks that he had purchased from Ashton. Nevertheless, it is Doris Grigsby's mental intent that determines the propriety of her conviction under criminal § 4224(a). The jurors should have been instructed so that they could have made a factual determination as to whether the Grigsbys had the specific intent to violate criminal § 4224(a).

then they could not have been convicted criminally under specific intent section 4224(a). The jurors should have been so instructed.

Furthermore, we are troubled that the district judge instructed the jury that section 4224(a) could be violated if the Grigsbys "either knowingly *or fraudulently* imported into the United States raw African elephant ivory." R15-1089 (emphasis added). By including "fraudulently" in addition to "knowingly" as a modifier for "imported," the judge used the indictment language which the government provided in its proposed jury instruction rather than the statutory wording.[25] The judge recognized in discussing the required intent for criminal violation of the AECA with counsel that "fraudulently" was not in the statute: "I do note that Count Two [the AECA count] of the indictment also contains the word fraudulently, but I am unable to find that word in the Act." R14-917.

We have determined that the district judge erred by including the modifier "fraudulently" in her instruction to the jury with respect to violation of the AECA because this adverb is not in the statute. The jury could have been misled or confused by this instruction in its consideration of the testimony concerning the separate moving of the ivory tusks into the United States, for

---

[25]The district judge's instruction, defining violation of the AECA, tracks the language of the superseding indictment, R1-47, and the government's Request to Charge No. 15, R4-78, quoted in footnote 13, *supra,* instead of the statute, 16 U.S.C. § 4224(a). We additionally note that "fraudulently" does not appear in the respective, proposed jury instructions describing violation of § 4224(a) by David and Doris Grigsby. *See* R4-74-11; R4-77-17. In contrast to the language of the superseding indictment and the government's proposed instruction, the Grigsbys' proposed instructions focus on specific *knowledge* of violating the AECA.

example, the testimony of Kathy Rye. Was Doris Grigsby's instruction to Kathy Rye to cover the tusks and to appear to be sleeping on them fraud, resulting from her absolute knowledge that she was violating the AECA, or was it her attempt to avoid having to explain at Customs her purported rationale, based on the Department of the Interior Facts sheet on ivory and her abandonment theory, that the ivory tusks had become part of the Grigsbys' household effects?[26] The injection of fraud into the jurors' consideration could have misled them and resulted in their determination of guilt on Count Two, when their only consideration should have been whether Doris and David Grigsby *specifically knew* that they were violating the AECA in moving the ivory tusks into the United States. The relevant intent for violation of section 4224(a) is the Grigsby's knowledge of violating the AECA *when the ivory tusks were transported into the United States.* Additionally, the evidence does not establish clearly that the Grigsbys had formulated a commercial purpose at that point in time. If they sincerely believed that the ivory tusks were theirs based on an abandonment theory, then they could have believed that the tusks were part of their household goods.

As we have explained, the district judge as well as the government and defense counsel engaged in extended discussions

---

[26]Indeed, in discussing the household effects exception, 50 C.F.R. § 23.13(d)(2), analyzed subsequently, the district judge concluded that it was applicable to the AECA, the Endangered Species Act, and the Migratory Bird Treaty Act. *See* R15-1071 ("I think from what I have heard you all say so far that this exception [the personal baggage/household effects exception] does apply to the three contrary to law provisions that we have discussed so far.").

concerning the intent required to violate section 4224(a) of the AECA. With no definitive federal court interpretation and counsels' disagreement as to the requisite intent, the district judge understandably became exasperated with the lack of guidance available to her. We particularly are troubled that, in their prosecutions and convictions, David Grigsby, a taxidermist, and Doris Grigsby, with a high-school education, neither of whom were shown to be cognizant of United States import/export law, were held to knowledge of the controlling law in this case that confused and confounded the district judge, counsel, and even the United States Department of the Interior, Fish and Wildlife Service agent, who implements the law and attempted to explicate it for the judge.

Not only did the judge give a general instead of a specific intent instruction, but also she instructed the jury to consider fraud, rather than directing deliberations as to consideration of *specific knowledge* of violating the AECA as the sole requirement for conviction under criminal section 4224(a), as evidenced by the legislative history. While David and Doris Grigsbys' conduct may have been violative of civil section 4224(b), they should not have been convicted criminally on specific intent section 4224(a) with the general intent instruction given by the district judge, further erroneously complicated by adding the consideration of fraud, which is not in the statute. *See Cruthirds v. RCI, Inc.,* 624 F.2d 632, 636 (5th Cir.1980) ("[W]e need not decide whether the verdict in this case was against the great weight of the evidence, since our own review of the record has revealed a fundamental error in the district court's instructions to the jury."). In addition to the

district court's erroneous instruction that general intent was all that was required for criminal violation of section 4223(1) of the AECA and her refusal to give defense counsels' instructions on the requisite specific intent required to violate the AECA knowingly, we find the exceptions, addressed below, to be applicable.

2. *Sport-Hunted Trophies Exception*

Section 4223 of the AECA provides an exception to the United States prohibition on importation of raw ivory for sport-hunted trophies:

> Individuals may import sport-hunted elephant trophies that they have legally taken in an ivory producing country that has submitted an ivory quota. The Secretary *shall not establish any moratorium* under this section, pursuant to a petition or otherwise, *which prohibits the importation into the United States of sport-hunted trophies from elephants that are legally taken by the importer or the importer's principal in an ivory producing country* that has submitted an ivory quota.

16 U.S.C. § 4222(e); 16 U.S.C. § 4223. The legislative history for this exception reveals its purpose:

> In a positive sense, I am pleased that this legislation contains language exempting legitimate sport trophies from any moratorium the Secretary may place on a particular country. This language is critically important because without the vital infusion of capital that sport hunters provide, there would be no incentive to protect these elephants. Based on my experience, there is no question that if the African elephant, which is now a valuable commodity, no longer has any financial value, then African governments will simply stop spending their meager resources to protect them. As a result, these elephants will be slaughtered—even in places like Botswana and Zimbabwe—for meat and for the illegal ivory trade. Sport hunted ivory, which is a minuscule percentage of ivory exports, is biologically sound and it produces by far the greatest economic return for the producing nation.

134 Cong. Rec. 21,013 (1988) (statement of Rep. Fields); *see* H.R.Rep. No. 827, 100th Cong., 2d Sess., at 13 (1988) ("All wi[ ]t[n]esses expressed opposition to a total ban [on raw ivory],

except Dr. Lieberman of the Humane Society."). Incorporated in the AECA is the following congressional finding: "There is no evidence that sport hunting is part of the poaching that contributes to the illegal trade in African elephant ivory, and there is evidence that the proper utilization of well-managed elephant populations provides an important source of funding for African elephant conservation programs." 16 U.S.C. § 4202(9).

Because section 4223 allows an exception for sport-hunted trophies, ivory tusks acquired in compliance with section 4222(e) are not part of the AECA moratoria. Furthermore, this exception addresses only the *importation* of sport-hunted trophies; it does not provide that the character of sport-hunted trophies changes if they ultimately are sold and used commercially. That is, under the plain language of section 4222(e), the characterization of sport-hunted trophies remains the same, despite a later change in ownership or the subsequent sale for a commercial purpose.

This exception is permitted because sport hunters do not engage in the mass slaughter of African elephants because they are controlled by the quota system of ivory producing countries, which the statute recognizes. Thus, sport-hunted trophies consume a finite amount of African elephant ivory. As the legislative history of section 4222(e) reveals, allowing sport-hunted trophies preserves the African elephant from destruction by Africans, who appreciate the value placed on these elephants by sport hunters. "In determining the meaning of the statute, we look not only to the particular statutory language, but to the *design of the statute as a whole and to its object and policy.*" *Crandon v. United States,*

494 U.S. 152, 158, 110 S.Ct. 997, 1001, 108 L.Ed.2d 132 (1990) (emphasis added); *accord McCarthy v. Bronson,* 500 U.S. 136, 139, 111 S.Ct. 1737, 1740, 114 L.Ed.2d 194 (1991); *Chandler,* 996 F.2d at 1084. "[T]o perpetuate healthy populations of African elephants" is the purpose of the AECA. 16 U.S.C. § 4201. The conduct that the AECA seeks to prohibit is the "large *illegal trade* in African elephant ivory[, which] is the major cause of th[e] decline [of the African elephant population] and threatens the continued existence of the African elephant." 16 U.S.C. § 4202(2). The legislative history, congressional findings, and section 4222(e) evidence that lawful, sport-hunted trophies do not deplete African elephants sufficiently to be protected under the AECA and that preservation of elephants for sport hunters actually protects African elephants by placing considerable value on live elephants. Consequently, importation of sport-hunted trophies does not violate section 4223(1) of the AECA and cannot be subject to criminal penalties under section 4224(a).

All of the African elephant tusks at issue in this case were sport-hunted lawfully in Africa by Ashton before the effective date of the AECA and legally imported into Canada, where they remained part of his private collection for approximately thirty years.[27] Ashton commissioned the Grigsbys to locate a buyer for the ivory tusks. Having Doris Grigsby cash his certified check made out to Grigsby Taxidermy and give the money to him, Enright purchased the tusks directly from Ashton on November 8, 1988. Thus, the Grigsbys

---

[27]In its trial brief, the government concedes: "The exception, denoted "Sport-hunted trophies' obviously refers to the original hunter, in this instance, R.W. Ashton." R4-76-4.

served in an agent/bailee capacity for Ashton with respect to *his* sale of the tusks to Enright.[28]  The ivory tusks, however, remained on the Grigsbys' premises for four years following the purchase by Enright from Ashton, who died during this time.  Ashton did not withdraw his agency authority given to the Grigsbys before his death.

By August, 1992, the Grigsbys considered the tusks, for which they had received no storage fees, to have been abandoned by Enright.  Because the tusks could not revert to the original owner, Ashton, the Grigsbys believed that the tusks belonged to them as Ashton's agents and were part of the Grigsbys' household goods. There is no evidence in the statute or its legislative history that the AECA was enacted to punish such a transfer of possession. Rather, the AECA seeks to punish those who diminish African elephant populations for a commercial purpose, as opposed to sport-hunted elephants, which are covered by this exception.  Thus, the sport-hunted status of the ivory tusks at issue would inure to the Grigsbys as Ashton's agents.

Significantly, the purchase of the ivory tusks by Enright or their transportation into the United States by the Grigsbys does not affect the original sport-hunted status of the elephants from which the tusks came.  Under section 4222(e), lawful, sport-hunted ivory is exempted from coverage by the AECA. The ivory tusks at

---

[28]In its trial brief, the government considers the Grigsbys to have served as agents for Ashton and then Enright, after his purchase of the ivory tusks:  "The evidence in this case shows that, with respect to the ivory, the Grigsbys were never more tha[n] agents.  It was owned by R.W. Ashton until November 8, 1988 and, thereafter, by Kenneth Enright."  R4-76-3.

issue in this case, already excluded from AECA coverage under section 4222(e) because of their sport-hunted origin, did not become recharacterized or transformed in status because they were purchased by Enright for a commercial purpose or because the Grigsbys, after reestablishing residence in the United States, attempted to have Enright pay them for one of the tusks, whether their reason was to get his attention or greed.[29]  This limited amount of ivory is not the "large illegal trade in African elephant ivory" that the AECA prohibits.  16 U.S.C. § 4202(2).

In granting each defendant a three-level downward departure at sentencing, the district judge stated her view that the "heart of the illegal conduct in this case was bringing the ivory tusks into the United States illegally," R16-78, and that "[t]here is no evidence that they intended to traffic or to place them generally on the market," *id.* at 79.  Despite the district judge's misunderstanding of the sport-hunted trophies exception to the AECA,[30] we agree with her conclusion that there is no evidence that

---

[29]Indeed, the district judge apparently considered the Grigsbys' attempt to obtain money for the tusks to be their most culpable conduct in this case, although she acknowledged that it was outside the coverage of any of the criminal statutes under which they were indicted:

> I think their plan was to try to take advantage of Mr. Enright, which again, I think, is certainly culpable conduct on their part, *not the conduct they were charged with,* but in my mind it is the worst part.  It is the most morally culpable thing that they did in this case, but again, *that is a consideration that is entirely outside the focus of these criminal statutes.*

R16-79-80 (emphasis added).

[30]The district judge agreed with the government's interpretation that the AECA "is aimed at trafficking in these items [ivory tusks]" because "bring[ing] these types of goods

the Grigsbys intended their attempt to sell the tusks to Enright to be a commercial endeavor.  The Grigsbys wanted to divest themselves of the ivory tusks that they had stored for Enright for four years without payment of storage fees.  It is only illegal trade, connoting unlawful commercial undertakings, that the AECA bans. The ivory tusks at issue in this case were exempted from coverage under the AECA because they were sport-hunted trophies.  The sale of the tusks to Enright, with the Grigsbys serving as his agents, and the Grigsbys' subsequent attempt to obtain money from Enright for whatever reason, including their storage services, are irrelevant to the excepted, sport-hunted character of the tusks in fulfilling the purpose of the AECA and in preventing a large-scale or profitable incentive or trade in African elephant ivory.

The district judge rejected defense counsels' argument that " "sport hunted trophies from elephants that are legally taken by the

---

into the United States ... may arguably tend to whet the appetite of the public for such items, and thereby encourage more trafficking."  R16-79.  Nevertheless, the judge viewed the statutory purpose "as being a lesser goal of the statutes as opposed to the goal of keeping people from going out and hunting these species," which comports with the stated purpose of the statute.  *Id.* While recognizing that the ivory tusks at issue in this case were sport-hunted, the judge misapprehended the purpose of the sport-hunted trophies exception by confusing an illegal commercial purpose in African elephant ivory trade with the limited and lawfully controlled, sport-hunted trophies exception, which preserves live African elephant populations:

> The reason I think that is because the statutes themselves do recognize an *exemption for sport hunted trophies.*  These are items that *can be legally brought into the United States,* and it seems to me that the presence of a *sport hunted trophy such as these tusks* in the U.S. would tend to whet the public appetite for ivory just as much as these tusks would in the Grigsby's residence in Toccoa, Georgia.

*Id.* (emphasis added).

importer or the importer's principal in an ivory producing country that has submitted to an ivory quota' " encompassed the Grigsbys as Ashton's agents. R14-918 (quoting 16 U.S.C. § 4222(e)). Doris Grigsby submitted Request to Charge No. 31, dealing with the sport-hunted trophies exception and agency: "I charge you that it is not a violation of the African Elephant Conservation Act to import into the United States sport-hunted elephant trophies that are legally taken by the importer or by the importer's principal in an ivory producing country." R4-77-31 (citing 16 U.S.C. § 4222(e)). The district judge specifically refused to give this instruction, R15-984, and Doris Grigsby's counsel objected to the judge's failure to do so, *id.* at 1100.

Consequently, the jury was not informed that the sport-hunted trophies exception applied to the ivory tusks in this case. We conclude that the jury should have been instructed on the sport-hunted character of the ivory tusks at issue in this case and should have been told that the Grigsbys were acting as agents for Ashton in the sale of the tusks to Enright, which entitled them to coverage under the sport-hunted trophies exception. The district judge erred in failing to instruct the jury on this exception. Because the sport-hunted trophies exception was applicable to the ivory tusks in this case, the Grigsbys' criminal violation of the AECA under section 4224(a) is precluded.

3. *Pre-Convention Exception*

Articles III and IV of CITES govern the permits and certification for import, export or re-export of species listed in Appendices I and II. CITES provides an exemption from its

regulations

> Where a Management Authority of the State of export or re-export is satisfied that a *specimen was acquired before the provisions of the present Convention applied to that specimen,* the provisions of Articles III, IV and V shall not apply to that specimen where the Management Authority issues a certificate to that effect.

CITES, art. VII, para. 2, 27 U.S.T. at 1099 (emphasis added). The Code of Federal Regulations has a similar exception:

> The prohibitions in § 23.11(b) through (d) concerning importation, exportation and re-exportation shall not apply to wildlife or plants when a certificate has been issued by the management authority of the country of origin or the country of re-export to the effect that *the wildlife* or plant *was acquired prior to the date the Convention applied to it.*

50 C.F.R. § 23.13(c) (emphasis added).

The government acknowledges in its trial brief that "[t]he provisions of Article III do not apply in the case where a Management Authority of the State of re-export (Canada) is satisfied (1) that a specimen was acquired before the provisions of the present convention applied to that specimen, *and* (2) the Management Authority issues a certificate to that effect." R4-76-2. The government's position, however, is that this exception is inapplicable because "[t]he evidence in this case is that the Canadian Management Authority has *no record of any application or permit* in the names Doris Grigsby, David Grigsby and/or Grigsby Taxidermy Studio." *Id.* (emphasis added). To the contrary, the record contains two requisite Canadian, CITES export permits, showing Doris Grigsby as the exporter for the ivory tusks. The first export permit, Government Exhibit 49, was issued by the Canada (Ontario) Management Authority on October 20, 1988, for eight tusks harvested from 1965 through 1973. The consignee is

Enright at his Altamont Company in Thomasboro, Illinois. This export permit was cancelled when Enright changed the destination or consignee for the ivory tusks. The second export permit, Government Exhibit 51, was issued by the Canada (Ontario) Management Authority on November 8, 1988, for nine tusks harvested from 1965 through 1973. This export permit, obtained when Enright came to Canada, included the additional tusk for which he negotiated directly with Ashton. The consignee for the second export permit is George Wong at his factory in Kowloon, Hong Kong. Both export permits show the country of origin for the tusks as the Republic of Zambia.[31]

Significantly, the Canadian Management Authority, which, under CITES, certifies endangered animals or animal parts for export from Canada, twice has certified the ivory tusks in this case for export as pre-Convention acquisitions. One of these certifications was to the United States, which accepts such certification from a CITES signatory country and would have excepted the tusks in question under 50 C.F.R. § 23.13(c). The dates of harvest for the

---

[31]Government Exhibit 47 is Ashton's certificate of ownership, issued November 8, 1967, from the Republic of Zambia for two of the tusks. While such official certificates of ownership are not in the record for the other seven tusks, there is testimonial evidence from a hunter who accompanied Ashton on some of the safaris as to the dates of harvest and CITES markings on the tusks. See CITES, art. VI, para. 7, 27 U.S.T. at 1099 (stating that, "[w]here appropriate and feasible," a "mark," consisting of "any indelible imprint" may be affixed "upon any specimen to assist in identifying the specimen"). Moreover, the Canadian Management Authority, which certifies the dates of harvest and determines pre-CITES acquisition, was satisfied that all of the ivory tusks involved in this case were obtained before the application of CITES. This is all that is required by CITES and, hence, the AECA, which uses the CITES identification system.

implicated tusks remain the same. Consequently, they are pre-Convention acquisitions and exempt from the application of CITES as stated in Article VII, paragraph 2, thereof and in 50 C.F.R. § 23.13(c). The fact that the Grigsbys did not have yet another certificate for the same, previously and officially declared pre-Convention ivory tusks, only seven of which were transported into the United States in 1992,[32] might have subjected them to civil penalties under the AECA, but the lack of this certification would not have made them criminally liable. [33] Clearly, the Canadian Management Authority would have issued certification designating the tusks as harvested pre-Convention because the tusks are exempt from CITES under Article VII, paragraph 2 and, consequently, are excepted from the AECA under 50 C.F.R. § 23.13(c).[34]

In relevant part, Doris Grigsby's Request to Charge No. 22 explains the pre-Convention exception:

> I further charge you that Article VII of the treaty [CITES] provides that import and export permits are not necessary for specimen[s] that have certificates showing they were acquired before the effective date of the treaty. CITES, T.I.A.S. 8249, 27 U.S.T. 1089, 1099.
>
> Therefore, if you find that any or all of the species which are the subject of the indictment were acquired before the July 1, 1975 effective date of the treaty, then you can

---

[32]The Grigsbys sold two of Ashton's nine ivory tusks in Canada. Only seven tusks are at issue in this case.

[33]The inability to indict and to prosecute the Grigsbys criminally is augmented by the sport-hunted exception, addressed previously, and the household effects exception, discussed subsequently.

[34]We reiterate that the African elephant first was protected in the United States under CITES on February 4, 1977, *after* the effective date of CITES on July 1, 1975.

find that those species are exempt from the provisions of the treaty, and therefore are not subject to any of the United States statutes enacted to enforce that treaty.

For example, if you find that the ivory tusks were acquired by Mr. R.W. Ashton and or his family prior to July 1, 1975, based upon the certificate of ownership and testimony in this case, then you can find that those items were acquired prior to the effective date of the treaty. You can then find that those items are exempt from the permit provisions of the treaty and that those items are not subject to any United States laws enacted to enforce the treaty, which are the laws the defendants are charged with violating in this case, such as the provisions regarding import or export permits for certain species.

In the event you so find that the species are exempt, then you must acquit these defendants.

R4-77-22-1-2 (citing CITES, 27 U.S.T. 1089, T.I.A.S. No. 8249).

At the charge conference, the district judge specifically informed defense counsel that she would not give this instruction.[35] Doris Grigsby's counsel attempted to explain that "there is a pre-Convention exemption if you can show that that stuff was acquired between '65 and '73 before the Convention, then it can come in." R15-1079. The judge became diverted with Government

---

[35]In reviewing the requests to charge submitted by defense counsel at the charge conference, the district judge specifically rejected Doris Grigsby's Request to Charge No. 22:

> THE COURT: Any objection to 22? Never mind. I won't give 22. This is the business about they are exempt from the Act because Ashton had them before the Act became effective. I won't give 22.
>
> MS. BECKER [Doris Grigsby's attorney]: You won't give 22?
>
> THE COURT: No.
>
> MS. BECKER: Your Honor, that is one of the theories of the defense.
>
> THE COURT: Right.

R15-981.

Exhibit 47, the Zambian certificate of ownership issued to Ashton for two of the tusks. After Doris Grigsby's counsel tried to explain that the dates of harvest, ranging from 1965 through 1973, were shown on Government Exhibit 51, one of the export permits certified by the Canadian Management Authority, the district judge concluded: "The court will rule that the provisions of section 23.13(c) do not apply in this case in that there is no evidence that a proper certificate was issued by the management authority of the country of origin, or the country of re-export." *Id.* at 1080. Following the jury charge, Doris Grigsby's counsel specifically objected to the district judge's failure to instruct the jury on the pre-Convention exemption in her Request to Charge No. 22. *Id.* at 1100.

Because the jury had no instruction on the pre-Convention exception, it had no opportunity to determine whether the ivory tusks in question were exempted from coverage under the AECA, although they were harvested *before the effective date of CITES.* With a proper instruction on the preConvention exception,[36] the jury should not have convicted the Grigsbys criminally under the AECA. At sentencing, the district judge ironically recognized that the age of the tusks, or their pre-Convention status, exempted them

_____

[36]The district judge mistakenly believed that, for application of the pre-Convention exception, documentation from the country of origin was necessary. In this case, such documentation would have been relevant only to the Canadian Management Authority to issue an export permit. Once the Canadian Management Authority determined that the implicated ivory tusks were excepted as pre-Convention harvests, the United States would accept that determination from a CITES signatory country. CITES, art. 7, para. 2, 27 U.S.T. at 1099; 50 C.F.R. § 23.13(c).

from the coverage and purpose of the AECA as an endangered species statute enacted to implement CITES:

> The thing that makes this case a bit idiosyncratic on its facts in my opinion is the fact that *these tusks were so old.* As I indicated, I think the whole thrust of these statutes is to protect endangered wildlife, but *these elephants were killed before 1975* [CITES effective date], and the tusks were in the legal possession of Mr. Ashton in Canada after that date. *I see the age of these tusks as being a factor that tends to divorce the importation of the tusks from the social harm that is sought to be protected by these wildlife acts.*

R16-78 (emphasis added). We conclude that the district judge erred in not giving the jury an instruction on the pre-Convention exemption with respect to the ivory tusks in this case.[37]

D. *Personal Baggage/Household Effects Exception*

A household effects exemption is contained in CITES for endangered species included thereunder:

> *The provisions of Articles III, IV and V shall not apply to specimens that are personal or household effects.* This exemption shall not apply where:
>
> (a) in the case of specimens of a species included in Appendix I, they were acquired by the owner outside his State of usual residence, and are being imported into that State; or
>
> (b) in the case of specimens of species included in

---

[37]We want to be clear that our determination that the subject tusks in this case are covered by the pre-Convention exception is not intended to undermine the CITES ivory trade control provisions or the AECA moratoria. We recognize that the potential exists for untruthful representations in future cases that imported ivory is exempt because it was harvested pre-Convention. Accepting such false representations actually could exacerbate the slaughter of African elephants and defeat the purpose of CITES and the AECA to save African elephants from extinction. We caution that our conclusion that the ivory tusks *in this case* are exempt because they were harvested pre-Convention is limited to the specific facts in the record, including documentation and testimony verifying the pre-Convention acquisition of the tusks. The ivory to which the pre-Convention exception applies is a limited and closed class of ivory.

Appendix II:

>> (i) they were acquired by the owner outside his State of usual residence and in a State where removal from the wild occurred;

>> (ii) they are being imported into the owner's State of usual residence;  and

>> (iii) the State where removal from the wild occurred requires the prior grant of export permits before any export of such specimens;

> unless a Management Authority is satisfied that the specimens were acquired before the provisions of the present Convention applied to such specimens.

CITES, art.  VII, para. 3, 27 U.S.T. at 1099-1100 (emphasis added).

Similarly, 50 C.F.R. § 23.13(d) provides:

> The prohibitions in § 23.11(b) through (d) concerning importation, exportation and re-exportation *shall not apply to wildlife* or plants that are *accompanying personal baggage or part of a shipment of the household effects of persons moving their residences to or from the United States:  Provided,* That this exception shall not apply to:

>> (1) Importation by U.S. residents of wildlife or plants listed in appendix I that were acquired outside the United States;  or

>> (2) Importation by U.S. residents of wildlife or plants listed in appendix II that were taken from the wild in a foreign country, if that country requires export permits.

50 C.F.R. § 23.13(d) (first emphasis added).

The following information, regarding noncommercial ivory shipments, was stated in the Fish and Wildlife Facts information sheet on ivory issued by the Fish and Wildlife Service of the United States Department of the Interior that Doris Grigsby obtained from the Canadian Management Authority when she acquired the second export permit for the ivory tusks on November 8, 1988:

> Non-commercial shipments.  *Raw and worked ivory may be imported and reexported for personal use (accompanying personal baggage) without CITES documents.*  However, some foreign countries require that CITES permits be obtained prior

to entry/exit. We recommend that individuals contact foreign countries prior to their travels to determine what is required. Addresses of foreign authorities to contact are available from the Office of Management Authority (OMA).

*Ivory,* Fish & Wildlife Facts (Fish & Wildlife Serv., U.S. Dept. of the Interior, Washington, D.C.) Jan. 1988 (emphasis added).

The AECA defines "personal effects" in conjunction with moving to or from the United States: "the term "personal effects' means articles which are not intended for sale and are part of a shipment of the household effects of a person who is moving his or her residence to or from the United States, or are included in personal accompanying baggage." 16 U.S.C. § 4244(9). The definition of "personal effects" in the AECA is useful because that statute is part of the Endangered Species Act of 1973, as amended, to which the relevant federal regulations apply.[38] Thus, the AECA "personal effects" definition must be read in context with the overall statutory scheme of which it is a part and not separate or in conflict with the rest of the legislation. *See Medtronic, Inc. v. Lohr,* --- U.S. ----, ----, 116 S.Ct. 2240, 2250, 135 L.Ed.2d 700 (1996) (recognizing that the judicial interpretation of statutory

---

[38]Struggling with the precise meaning of "accompanying personal baggage," the district judge inquired about 50 C.F.R. § 23.13(d)(1):

> THE COURT: What does the term accompanying personal baggage mean?

> MR. FARRELL [AUSA]: I don't think it is defined in the regulations, Your Honor.

R15-1072. The useful definition of "personal effects" in 16 U.S.C. § 4244(9) cannot be isolated from the overall wildlife protective scheme, embodied by the Endangered Species Act of 1973, as amended, and accompanying federal regulations implementing CITES, of which the AECA is a part.

language "does not occur in a contextual vacuum"); *Passamaquoddy Tribe v. Maine,* 75 F.3d 784, 789 (1st Cir.1996) ("Put simply, courts must recognize that Congress does not legislate in a vacuum."). To allow a statutory subsection to subvert another part of the regulatory scheme "would contravene the "elementary canon of construction that a statute should be interpreted so as not to render one part inoperative.' " *Department of Revenue v. ACF Indus., Inc.,* 510 U.S. 332, 340, 114 S.Ct. 843, 848, 127 L.Ed.2d 165 (1994) (quoting *Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana,* 472 U.S. 237, 249, 105 S.Ct. 2587, 2594, 86 L.Ed.2d 168 (1985)); *City of Jamestown v. James Cable Partners, L.P. (In re James Cable Partners, L.P.),* 27 F.3d 534, 537 (11th Cir.1994) (per curiam) (determining that statutory subsections must be read in conjunction with other parts of the statute).

The government's position in this case has been that the Grigsbys violated United States law because they did not have Canadian export permits for the elephant tusks, polar bear, black bear, and harp sealskins, a barred owl, a saw whet owl, a kestrel, and goshawk.[39] Doris Grigsby submitted Request to Charge No. 24 regarding the personal baggage/household effects exception:

> I charge you that under the federal statutes the prohibition to importing endangered wildlife or plants shall

---

[39]Although the indictment charges David and Doris Grigsby with importation of additional endangered birds protected by the Migratory Bird Treaty Act, the government's request to charge states that "the defendants did in fact possess any one of the 4 migratory birds charged in the indictment, namely, a Barred Owl, a Saw Whet Owl, a Kestrel, or the Goshawk," R4-78-24(1), and the district judge instructed the jury regarding only these four birds protected by the Migratory Bird Treaty Act, R15-1093. Therefore, we conclude that the government proved that the Grigsbys possessed these four endangered birds solely.

not apply to wildlife or plants that are accompanying personal baggage or part of a shipment of the household effects of persons moving their residences to the United States.

I also charge you that under the CITES treaty, the permit provisions "shall not apply to specimens that are personal or household effects."

R4-77-24 (citing 50 C.F.R. § 23.13; CITES, 27 U.S.T. 1099, T.I.A.S. No. 8249).

The district judge specifically refused to give the household effects instruction submitted by Doris Grigsby's counsel. R15-983. In her discussion with counsel concerning this exception, however, the district judge inquired about three aspects that were not clear to her, and she commented that she "was hoping that [counsel] would have a lot more background and perspective on this issue than [the judge did]." *Id.* at 1062-63. First, she queried as to whether the household effects exception applied to the wildlife protected under the Endangered Species Act, or the bear and seal skins.[40] Second, she inquired as to the distinction between United States citizen and resident regarding application of the household effects exception.[41] She concluded that section 23.13(d) *applied to United*

---

[40]The following statement by the district judge indicates her belief that the household effects exception applied to the wildlife protected by the Endangered Species Act:

> Well, I'm really looking at Count Four [the Endangered Species Act violations] right now. So, it looks to me like the importation of the harp seal skins would not have been contrary to law *if they constituted household effects pursuant to the move, or if they were accompanying personal luggage.*

R15-1063 (emphasis added).

[41]The following comments indicate the district judge's concern with the distinction between United States citizen and resident as to application of the household effects exception:

*States residents* and that "it is my impression that the Grigsbys were perhaps planning on establishing a residency, *but they weren't residents when they crossed the border.*" *Id.* at 1067 (emphasis

---

23.13(d)(2), the prohibition is in section 23.11(b) through (d) concerning the importation and exportation, and re-exportation shall not apply to wildlife or plants that are accompanying personal baggage or part of a shipment of the household effects of persons *moving their residences to or from the United States.*

I don't see anything in 23.11(b) that refers to the fish or wildlife permit.

....

Section 23.13(d) says that the *prohibitions in section 23.11(b) through (d) concerning importation, exportation, and re-exportation shall not apply to wildlife* or plants that are *accompanying personal baggage or part of a shipment of the household effects of persons moving their residences to or from the United States* provided that *this exception shall not apply to importation by U.S. residents* of wildlife or plants listed in Appendix [I] or that were acquired outside the United States, or importation by *U.S. residents* of wildlife or plants listed in Appendix [II] that were taken from the wild in a foreign country if that country requires export permits.

Now, *under the evidence,* it seems to me that *neither Mr. or Mrs. Grigsby were U.S. residents.* Do you all disagree with that?

....

Okay. Let's work through it. Section 23.11(b) through (d), those are prohibitions. *23.13(d) says that those prohibitions do not apply to wildlife accompanying personal baggage or part of a shipment of the household effects of persons moving their residences to or from the United States.*

....

Yes, but that *subsection [d](2) [of 50 C.F.R. § 23.13] specifically says importation by U.S. residents.*

R15-1064, 1065, 1066, 1067 (emphasis added).

added).  Third, she determined that the household effects exception encompassed the elephant tusks.[42]

At the charge conference, the district judge correctly stated that "if there is a possibility that they could qualify;  in other words, if they could convince the jury that the tusks or the seal skins or the bearskins were household effects, then the jury should be instructed about these provisions, but if as a matter of law they can't be, then the instruction should not be given."  *Id.* at 1061.  Although the district judge instructed the jury that the wildlife brought into the United States by the Grigsbys required certain permits under the wildlife statutes at issue in this case, she also instructed that the household effects exception applied.[43]

---

[42]In discussing the household effects exception, the district judge appeared to believe that it applied to the elephant tusks as well as the other wildlife involved in this case:

> Well, then, *it appears to me that section 23.13(d) does apply,* but now my question at this point would be why wouldn't it apply to the elephant tusks?  I mean depending on what factual findings are made by the jury, and why wouldn't it apply potentially to the bearskins?
>
> ....
>
> You didn't answer the question I'm asking, though. I'm look[ing] still at this CFR exception in 23.13(d) and asking you why that exception doesn't apply to the permit requirements, the import permit requirement for the tusks, and the export permit requirement for the bearskins?

R15-1066, 1070 (emphasis added).

[43]The district judge determined that the household effects exception applied to the three wildlife statutes involved in this case:

> I think I agree with the defense that with respect to the requirement of a wildlife permit, the

The judge gave the following instruction to the jury:

> Now, I have described to you three respects in which the government is contending that the importation of certain items was contrary to law. I further instruct you that *there is a so-called household effects exception to all of these provisions,* and *that exception provides that a permit or wildlife declaration form is not required for household effects which are being brought into the United States and which are not intended for sale in the United States.*

*Id.* at 1092-93 (emphasis added). Significantly, the district judge did not advise the jury of the distinction that section 23.13(d) does not apply to United States residents but to United States citizens.[44] At the end of the jury charge, Doris Grigsby's counsel specifically objected to the judge's failure to give her Request to Charge No. 24. *Id.* at 1100.

---

> requirement of a fish and wildlife declaration form, that the household effects exception and the accompanying personal baggage exceptions are relevant, and I will instruct the jury regarding that exception, but what is still not clear to me is whether this exception has a potential for application to the permit requirements under CITES.
>
>     ....
>
> I think from what I have heard you all say so far that *this exception [§ 23.13(d) ] does apply to the three contrary to law provisions that we have discussed so far.*
>
>     ....
>
> *I'm going to charge the jury that there is an exception for household effects not intended for sale, and that that exception applies to all of them.*

R15-1068-69, 1071, 1078 (emphasis added).

[44]This distinction precluding United States *residents* from moving endangered species with their household effects without CITES permits prevents frequent trips to Canada, for example, and returning to the United States with such endangered species. United States *citizens,* who are moving their *residences* to or from the United States, would occur infrequently. Thus, the potential of abusing this exception is alleviated.

Even under the household effects exception as given, the jury's verdicts with respect to the Grigsbys' transportation of the endangered bear and sealskins as well as the birds is inconsistent with the evidence. There is no evidence and clearly no proof that this wildlife was brought into the United States for a commercial purpose. To the contrary, the evidence revealed that the birds in question were David Grigsby's private collection of mounted birds and that the bear skin rugs as well as the harp seal skins were used in Canada and the United States as rugs and for decorative purposes in the Grigsbys' home. Indeed, Doris Grigsby designated these items on the contract with the moving van company as household items. Therefore, the evidence showed that the bear and seal skins as well as the birds were possessed lawfully and do not show any indication that these items were ever intended for sale.

Additionally, the district judge did not instruct the jury or emphasize that *section 23.13(d) specifically was applicable to the Grigsbys because they were not United States residents* when they brought the subject wildlife into the United States as opposed to the inapplicability of the household effects exception to United States residents. The Grigsbys had lived in Canada for fourteen years prior to their move to the United States. Thus, they were not United States residents and the household effects exception applied to them.[45] Although the district judge had found this to

---

[45]With respect to the applicability of the household effects exception to the Grigsbys regarding their ownership of the ivory tusks, the government acknowledges in its trial brief that "[e]ven if a credible argument of ownership can be made, the Grigsbys acquired the tusks *in* Canada, their residence since 1978." R4-76-3. Omitting this admission that the Grigsbys were not United States residents when they returned to the United

be an important distinction in her discussions concerning the jury charge with counsel, she did not convey this difference to the jury. Statement of the Grigsbys' non-United States residency status, in conjunction with their noncommercial purpose in possessing the implicated wildlife items, would have emphasized the applicability of the household effects exception and might have caused the jury to find that this exception was applicable.

The elephant tusks present a more complicated analysis. The district judge believed and instructed the jury that the household effects exception applied to the elephant tusks as well as to the other wildlife involved in this case. With the evidence of the Grigsbys' acting as agents for Ashton in his sale of the tusks, Doris Grigsby's sale of two of the tusks in Canada, and the Grigsbys' mailing of a tusk to Enright for payment on delivery could have caused the jury to conclude that there was a commercial purpose in the Grigsbys' possession of the tusks. Even if this were the case, the previously discussed sport-hunted trophies and pre-Convention exceptions would have foreclosed the Grigsbys' liability under the AECA, the statute implementing CITES, which the government alleges that they violated by moving the elephant tusks into the United States. Additionally, if the jury had been instructed on the Grigsbys' abandonment theory, the household

States in 1992 after their substantial residence in Canada, the government also represented to the district court in its trial brief that the household effects exception "does not apply to importations into this country of Appendix II species if the country of export, in this case Canada, requires an export permit, which it does. 50 C.F.R. § 23.13(d)(2)." *Id.* at 4-5. The government fails to recognize that § 23.13(d)(2) applies only to "[i]mportation by *U.S. residents.*" 50 C.F.R. § 23.13(d)(2) (emphasis added).

effects exception could have been considered applicable to the tusks.[46]

Therefore, we conclude that the jury verdicts as to the Grigsbys' unlawful importation of the specified wildlife is against the weight of the evidence and inconsistent with the household effects exception given in the jury instructions. According to CITES, 50 C.F.R. § 23.13(d), and the Facts information sheet on ivory, issued by the Fish and Wildlife Service of the United States Department of the Interior, the Grigsbys' not having a Canadian export permit did not violate United States law. The household effects exception specifically provides that nonresidents of the United States can move wildlife, such as the bear and sealskins as well as the birds at issue in this case, if these items are their personal, noncommercial possessions, which are moved as part of their household effects or residential belongings.[47] Because the

_____

[46]It is clear that the jury did not focus on the meaning and application of the household effects exception, particularly concerning the other wildlife involved in this case. Instead, the jury apparently concentrated on the major portion of the jury instructions devoted to the requisite export/import permits *if the household effects exception did not apply.* Furthermore, if the jury had been instructed on and believed the Grigsbys' abandonment theory, then they could have had the option of deciding that the earlier move of the elephant tusks into the United States and placement in storage for subsequent retrieval and moving with the rest of their household effects was because of the Grigsbys' fear of personal violence from Zanotti.

[47]The discussion among the court, counsel, and Agent Decker of the Fish & Wildlife Service makes clear that the export permit is a requirement of *Canada,* and that the household effects exception encompasses at least the bear and sealskins as well as the birds at issue in this case:

> THE COURT:  You didn't answer the question I'm asking, though.  I'm look[ing] still at this CFR exception in 23.13(d) and asking you why that exception doesn't apply to the permit requirements, the import permit

requirement for the tusks, and the export permit requirement for the bearskins?

MR. FARRELL [AUSA]:  First of all, because in 23.13(d)(2) it talks about Appendix 2, and if *that country,* meaning *the country from which the animals were taken,* requires a permit, and *Canada requires a permit for export.*

THE COURT:  Yes, but there again, *you are stuck with the words by U.S. residents.*  I see what you are saying.

MS. BECKER [Doris Grigsby's counsel]:  Your Honor, my argument is I think (d)(1) talks about CITES permits. I don't have it in front of me, but the tusks based on the government's argument is it is a CITES 1. So, therefore, it would apply as well, the exception would apply as well.

THE COURT:  It seems to me—I guess not all of these regulations are here before me, but looking back to the beginning of that section, Part 23, it is captioned Endangered Species Convention.  I think from what I have heard you all say so far that this exception does apply to the three contrary to law provisions that we have discussed so far.

        ....

AGENT DECKER:  In regard to the other wildlife in this case, the polar bears, the bears, and the seals, those are items—the black bears and the polar bears, those are the items that are Appendix 2 wildlife.

THE COURT:  Yes.

AGENT DECKER:  In that case, then, you go to Number 2 under 23.12 where it gives you the requirements for an *Appendix 2 species,* and *those species only require an export permit from Canada.*

THE COURT:  Right.

AGENT DECKER:  Then if you go on to the part that causes all this confusion, the part in 23.13, we have first covered the prohibitions, then we covered the requirements, and then the law provides an exception in 23.13.

    Now, that exception is over in paragraph (d) which says that there is an exception for household effects.

household effects exception clearly covers the endangered bear and sealskins as well as the birds at issue in this case, the jury erroneously convicted the Grigsbys of unlawfully importing the wildlife other than the ivory tusks. Additionally, it is possible that the jury, if properly instructed concerning the Grigsbys' abandonment argument, would have determined that the elephant tusks also were included in the household effects exception.

E. *Denial of Motions for Judgments of Acquittal*

Both David and Doris Grigsby moved for judgments of acquittal pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure.[48] The district judge denied these motions because she decided that there was sufficient evidence to sustain the verdicts. In deciding a Rule 29 motion for judgment of acquittal, a district court must "determine whether, viewing all the evidence in the light most

---

> However, in (d)(2) it says provided this exception shall not apply to Number 2 importations by U.S. residents of wildlife or plants listed in Appendix 2 that were taken from the wild in a foreign country if that country requires export permits, and there is testimony that Canada requires export permits.
>
> The notion that foreign people, foreigners, anybody other [than] United States residents, the door would just be wide open. It would simply defeat the law, and there is another part. If you turn back to 23.13(a), that says exceptions, and the last sentence in paragraph (a) says exceptions in one part cannot be invoked to allow activities prohibited by another part.
>
> THE COURT: *That's the whole purpose of an exception, though.* That doesn't make any sense.

R15-1070-71, 1074-75 (emphasis added).

[48]Alternatively, David and Doris Grigsby moved for a new trial. Because we have determined that their respective motions for judgments of acquittal should have been granted, we need not address their motions for new trial.

favorable to the Government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict, a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." *United States v. O'Keefe,* 825 F.2d 314, 319 (11th Cir.1987) (citation omitted); *see Jackson v. Virginia,* 443 U.S. 307, 316, 99 S.Ct. 2781, 2787, 61 L.Ed.2d 560 (1979) (holding that no defendant can be convicted criminally unless the government proves beyond a reasonable doubt every element of the offense). "The district court's decision on sufficiency of the evidence [in determining a motion for judgment of acquittal] is entitled to no deference by this court," *United States v. Taylor,* 972 F.2d 1247, 1250 (11th Cir.1992); our review of the denial of a defendant's motion for acquittal is *de novo, United States v. Perez-Tosta,* 36 F.3d 1552, 1556 (11th Cir.1994), *cert. denied,* --- U.S. ----, 115 S.Ct. 2584, 132 L.Ed.2d 833 (1995).

Considering the evidence in this case most favorably to the government and in view of the household baggage/personal effects exception given to the jury by the district judge, we find it unreasonable for the jury to have determined that moving into the United States the wildlife, other than the ivory tusks, with the Grigsbys' household goods was unlawful because it was part of their home furnishings. There is no evidence in the record that this wildlife was other than decoration for the Grigsbys' home, such as the bearskin rugs, or part of David Grigsby's mounted bird collection, which plainly fits within the household baggage/personal effects exception. The district judge might have

clarified the application of this exception if she had instructed the jury that the household effects exception *applied* to United States citizens moving their residences to the United States, like the Grigsbys, and not to United States residents.

With respect to the ivory tusks, even if the jury did not believe the Grigsbys' abandonment theory whereby they represented that the tusks had become part of their household belongings because Enright had failed to obtain them and had not paid storage for four years, two other exceptions precluded the importation of the tusks from being unlawful. The district court failed to instruct the jury on the sport-hunted trophies exception as well as the pre-Convention exception, both of which clearly applied to the tusks, as we have analyzed herein. *Cf. United States v. Johnson*, 542 F.2d 230, 232-33 (5th Cir.1976) (determining that the defendant's legal theory excusing his criminal conduct was insufficient as a matter of law, thus, the district court committed no reversible error in failing to instruct the jury on the theory or in not granting the motion for judgment of acquittal). This constitutes a legal error on the part of the district court because the Grigsbys should not have been convicted criminally for unlawful transportation of the ivory tusks into the United States when these exemptions preclude a finding of wrongdoing by the Grigsbys with respect to the particular tusks at issue because they were sport-hunted trophies as well as harvested prior to the effective date of CITES, which the Endangered Species Act of 1973 and its amendment, the AECA, implement.

On these facts, there could be no violation of the felony

importation statute because the importation was not "contrary to law." 18 U.S.C. § 545. Since the Grigsbys' conduct in this case did not constitute criminal violation of the subject statutes, they should not have been convicted for conspiracy to violate these statutes under the specific intent, federal conspiracy statute, 18 U.S.C. § 371, in Count I.[49] Because the jury convicted the Grigsbys contrary to the evidence regarding the household effects exception concerning the wildlife other than the ivory tusks, and the district judge did not recognize that the sport-hunted trophies and pre-Convention exceptions covered the ivory tusks as a matter of law and failed to so instruct the jury, the Grigsbys' convictions must be reversed and their respective motions for judgments of acquittal granted. *See Taylor,* 972 F.2d at 1250 (holding that the district court erred as a matter of law in its ruling on the defendant's motion for judgment of acquittal).

### III. CONCLUSION

Given the particular facts in this case, the Grigsbys'

---

[49]Indeed, the district judge's instruction on the conspiracy count could have be instrumental in the jury's convicting the Grigsbys:

> In this case, it is not necessary for the government to prove that the defendant under consideration willfully conspired to commit all three of the charged substantive offenses. *It would be enough if the government proves beyond a reasonable doubt that the defendant conspired with someone to commit one of those offenses,* but in that event, in order to return a verdict of guilty, the jury must unanimously agree upon which of the three offenses the defendant willfully conspired to commit. If the jury cannot agree in that manner, you would have to find the defendant not guilty.

R15-1102 (emphasis added). Doris Grigsby's counsel objected to this instruction. *Id.* at 1103.

criminal convictions for violating the AECA, the Endangered Species Act of 1973, and the Migratory Bird Treaty Act are untenable.  The jury was misinstructed on the AECA with erroneous or incomplete instructions, as we have explained herein.  The jury's verdicts with respect to the other wildlife conservation statutes are contrary to the jury instructions and evidence.  Accordingly, the convictions of David and Doris Grigsby are REVERSED, and the case is REMANDED to the district court with instructions to GRANT their respective motions for judgments of acquittal as a matter of law.