[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 24, 2000
THOMAS K. KAHN
CLERK

_____

No. 99-14274
Non-Argument Calendar

_____

D.C. Docket 98-00567-CR-DTKH

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JEFFREY C. NOLAN,

Defendant-Appellant.

_____

Appeal from the United States District Court for the
Southern District of Florida

_____

**(August 24, 2000)**

Before DUBINA, CARNES and HULL, Circuit Judges.

PER CURIAM:

Defendant-Appellant Jeffrey C. Nolan appeals his conviction after a jury

trial for major fraud against the United States, in violation of 18 U.S.C. §§ 1031 &

2, theft of public money, in violation of 18 U.S.C. § 641, and money laundering, in

violation of 18 U.S.C. §§ 641 & 1957. Nolan challenges the district court's jury instructions regarding the major fraud charges and argues that there was insufficient evidence to convict him on the money laundering charge. After review, we affirm Nolan's convictions.

## I.  BACKGROUND

The charges against Nolan resulted from his and his codefendant James Byrd's diversion of $3,547,693.00 in government-contract proceeds for personal use. Nolan was associated with PZ Construction Company, Inc. ("PZ"), which entered into several contracts to remove debris remaining in the Miami area after Hurricane Andrew. Nolan was involved with PZ's contract with the Army Corps of Engineers (the "ACOE"). PZ was to receive debris in a central location (the "Three Lakes site") from which it would transport the debris to various landfills. Under the contract, PZ began accepting debris on January 4, 1993, and received $31 to $33 per ton of debris it accepted for disposal. As a minority contractor, the ACOE was required to pay PZ every week. Testimony at trial established that instead of taking the debris directly to the landfills, PZ hired subcontractors to separate the debris into either (1) material that could be recycled and sold or (2) material that had to be taken to the landfills.

The "recycling" process took longer than simply taking the material to the

2

landfills, and thus the debris began to pile up at the Three Lakes site.[1]  On March

10, 1993, the Florida Department of Environmental Regulation (the "FDER")

ordered PZ to receive no additional debris at the Three Lakes site and to remove

the remaining debris because the piles of debris posed a health threat to the area.

By that time, the ACOE had paid PZ a total of $12,848,811.00.  After the FDER

issued the cease-and-desist order, the ACOE notified PZ that it would not make

any additional payments on the contract until PZ made satisfactory progress in

removing the debris from the site.  However, the ACOE resumed payment after PZ

made a request for additional payments, claiming that it needed to pay its

subcontractors.  Yet by December 1993, there was still a large amount of debris

remaining at the Three Lakes site.  On February 1, 1994, the ACOE terminated its

contract with PZ for non-performance.  Eventually, the ACOE paid D & J

Construction $5 million to complete the removal of debris at the Three Lakes site.

## A.     The Major-Fraud Charges

The ACOE eventually discovered that instead of using the ACOE's progress

---

[1]  Trial testimony indicated that the ACOE essentially acquiesced in PZ's practice of "recycling" the material from the site.  The ACOE had a contracting officer on site who would have known that PZ had been recycling since the beginning of the contract, and who did nothing to cause PZ to change the practice.  At trial, witnesses suggested that recycling was better for the area, both environmentally and economically, and noted that the news media had commented favorably on the practice of recycling the hurricane debris.

payments to PZ for the Three Lakes project, Nolan and his codefendant, James Byrd, were shifting some of the funds for their own personal use. As a result, the government charged Nolan with twenty-four counts of major fraud. The jury convicted Nolan of three of those counts of major fraud, all involving the delivery of checks. At trial, investigators testified that they had traced the money transferred by the three checks back to ACOE contract proceeds that were originally paid to PZ. Count Eleven involved a check for $150,000, dated March 4, 1993, that Nolan wrote to C.A. Killen, an accountant in Texas who performed no work on the Three Lakes project. Count Fifteen involved check for $100,000, dated April 5, 1993, also written to Killen. Killen eventually redirected to Nolan's real estate attorney, Joshua Manaster, a substantial portion of the $250,000 he had received from Nolan. Manaster put the funds towards a down payment on Nolan's $1.15 million house. Count Seventeen involved a check for $132,000, dated May 20, 1993, written from Killen to Manaster.

## B.    The Money-Laundering Charge

On August 5, 1993, the ACOE sent PZ a check for $595,970, which included $345,970 that was duplicated from a prior payment and was accidentally paid to PZ a second time. At trial, Nolan's administrative assistant, Sheila Carter, testified that she detected the duplicate payment and notified Nolan. Nolan told

her to deposit the entire amount into the PZ account, and that they would take care of it when the ACOE discovered the overpayment. Nolan's computer assistant, Miguel Michelena, testified that he also approached Nolan about the overpayment. Nolan told Michelena that they would worry about it if the ACOE caught its mistake.

Special Agent Edward Miller, of the Internal Revenue Service criminal investigation division, testified that in early August 1993, Nolan completed a wire transfer including the $345,970 duplicate payment. Nolan withdrew the money from the PZ account and deposited it into an account belonging to Renaissance Environmental Corporation ("Renaissance"). Renaissance was a "shell" corporation acquired by Nolan that did no work on the Three Lakes project. The jury convicted Nolan of money laundering as a result of the transfer of the duplicate payment from the PZ account to the Renaissance account.

The jury convicted Nolan of five of the twenty-seven counts in the indictment, including the three of the major fraud counts, one count of theft of public money, and one count of money laundering. The district court sentenced Nolan to a total of sixty-three months' imprisonment, and imposed a $10,000 restitution payment. Nolan timely appealed.

## II. STANDARD OF REVIEW

We review de novo "whether the district court misstated the law when instructing the jury or misled the jury to the prejudice of the defendant." United States v. Deleveaux, 205 F.3d 1292, 1296 (11th Cir.) (citation omitted), cert. denied sub nom, Deleveaux v. United States, 120 S. Ct. 2724 (2000). A district court's "refusal to give a requested jury instruction is reviewed for abuse of discretion, because [a] defendant is entitled to have the court instruct the jury on the theory of the defense, as long as it has some basis in the evidence and has legal support." United States v. Grigsby, 111 F.3d 806, 814 (11th Cir. 1997) (internal quotations and citation omitted). "We reverse when we are left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations." Id. (internal quotations and citation omitted).

We review a claim of insufficient evidence to sustain a conviction de novo. See United States v. Christo, 129 F.3d 578, 579 (11th Cir. 1997) (citation omitted). "We, however, view the evidence in the light most favorable to the government, with all reasonable inferences and credibility choices made in the government's favor." Id. (internal quotation and citation omitted). We must affirm the conviction if we find that "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. (internal quotation and citation omitted).

6

# III. DISCUSSION

## A. Major Theft Jury Instruction

The jury convicted Nolan of three counts of major fraud against the United States, in violation of 18 U.S.C. § 1031. Section 1031 reads, in pertinent part, as follows:

> Whoever knowingly executes, or attempts to execute, any scheme or artifice with the intent –
>
> > (1) to defraud the United States; or
> >
> > (2) to obtain money or property by means of false or fraudulent pretenses, representations, or promises,
>
> in any procurement of property or services as a prime contractor with the United States . . . if the value of the contract . . . for such property or services is $1,000,000 or more, shall [be subject to fines and/or imprisonment].

18 U.S.C. § 1031(a). Regarding the major fraud counts, the district court instructed the jury, in part, as follows:

> A defendant can be found guilty of a crime of committing major fraud against the United States only if all of the following facts are proven beyond a reasonable doubt.
>
> Now, the elements of this crime are set forth on pages eight and nine of the jury instructions.[2] Let's talk about them one by one.
>
> Number one, that the Defendant knowingly executed or attempted to

---

[2] The printed jury instructions are not part of the record on appeal.

7

execute a scheme with the intent to defraud the United States, or to obtain money by means of false or fraudulent pretenses, representations and promises.  <u>Second, that the scheme took place as part of the acquisition of money as a contractor with the United States</u> or as a subcontractor or a supplier on a contract with the United States.

Third, that the value of the contract . . . that is the value of the amount to be paid under the contract . . . was one million dollars or more.

R9 at 1662-1663 (emphasis supplied).

Nolan objected to the proposed jury instruction regarding the second element of the major-fraud offense.[3]   Nolan requested that the district court replace the following proposed language, "That the scheme took place as part of <u>the acquisition of money</u> as a contractor with the United States [or as a subcontractor]," with the following language drafted by Nolan: "That the scheme or artifice to defraud occurred as part of <u>any procurement of property or services</u> as a prime contractor with the United States, [or as a subcontractor]."  R8 at 1573 (emphasis supplied).  Nolan argued that the language he requested more accurately tracked the language of the major-fraud statute, as § 1031 uses the word "procurement" instead of the proposed instruction's "acquisition."  Also, § 1031 uses the words "property or services" instead of the proposed instruction's

_____

[3]  There is no Eleventh Circuit pattern jury instruction addressing the 18 U.S.C. § 1031 major-fraud offense.  Additionally, this Court has never examined jury instructions regarding 18 U.S.C. § 1031.

"money." Id. at 1574; 18 U.S.C. § 1031(a).[4]  The district court overruled Nolan's objection.

We have examined the jury instructions as a whole, and conclude that the district court's major-fraud jury instruction was a proper statement of the law, and did not mislead the jury.  See Deleveaux, 205 F.3d at 1296.  Although the district court's instructions did not track exactly the language of § 1031, the substituted words were similar in meaning to the words in the statute, and operated to clarify the meaning of the statute in the context of this case.  For example, "acquire" is a generally accepted synonym of "procure."  Webster's Third New International Dictionary 1809 (unabridged ed. 1993).  Additionally, "money" is simply the form of "property or services" that Nolan received from the government under the contract at issue in this case.  Because we conclude that the jury was properly guided by the instruction given by the district court, we also conclude that the district court did not abuse its discretion by refusing to give Nolan's requested version of the major-fraud jury instruction.[5]  See Grigsby, 111 F.3d at 814.

---

[4]  In the district court, Nolan also argued that the words "or artifice" should be included after the word "scheme," because the major fraud statute uses both terms.  18 U.S.C. § 1031(a).  The district court overruled this objection because the Eleventh Circuit pattern jury instructions regarding mail fraud and wire fraud use only the word "scheme," even though the statutes governing mail fraud and wire fraud, like § 1031, use "scheme or artifice."  Nolan has not raised this specific issue on appeal.

[5]  To the extent that Nolan argues that to violate 18 U.S.C. § 1031, the fraud must occur prior to or contemporaneous with the creation of the contract, we find that argument to be without

9

**B.     Sufficiency of the Evidence on Money Laundering Conviction**

Nolan was also convicted on one count of money laundering based on the withdrawal of the $345,970 duplicate payment from the PZ account and the deposit of that amount in the Renaissance account.  On appeal, Nolan argues that there was not sufficient evidence to sustain the money laundering conviction.

Money laundering occurs when one "knowingly engages or attempts to engage in a monetary transaction in criminally derived property."  18 U.S.C. § 1957.  The withdrawal of money from a bank account is a "monetary transaction."  18 U.S.C. § 1957(f)(1).  Money laundering is an offense to be punished separately from the underlying criminal offense, which in this case is the theft of the money from the government.  See United States v. Christo, 129 F.3d 578, 579 (11th Cir. 1997) (citation omitted).  Therefore, the primary issue in a money laundering charge involves "determining when the predicate crime becomes a 'completed offense' after which money laundering can occur."  Id. at 579-80 (citation omitted).

merit.  We believe that Congress intended § 1031 to sweep broadly to also cover fraud not only in the making of the contract, but also in the execution of the contract.  See United States v. Brooks, 111 F.3d 365, 369 (4th Cir. 1997) (stating that the legislative history of § 1031 indicated a wide range of concern not only with monetary loss resulting from fraud, but also with safety concerns stemming from, e.g., the provision of defective parts for helicopters and weapons).  We conclude that the district court's major-fraud jury instructions, considered in total, adequately stated the law applicable to violations of 18 U.S.C. § 1031.

Nolan's money laundering conviction was based on the transfer of the $345,970 from the PZ account to the Renaissance account. The predicate criminal offense was the initial theft of that money from the government. Therefore, to support Nolan's money laundering conviction, the government was required to prove that the theft offense was a completed criminal offense before Nolan withdrew the funds from the PZ account and deposited them into the Renaissance account. 18 U.S.C. § 1957(f)(2); United States v. Gregg, 179 F.3d 1312, 1315 (11th Cir. 1999).

On appeal, Nolan argues that the theft offense was not completed when the $345,970 was deposited in the PZ account, but only after Nolan transferred the funds to the Renaissance account. Since this transfer was an element of the money laundering offense, Nolan argues that he did not commit separate theft and money laundering crimes. We conclude, however, that the theft was a completed crime when Nolan ordered the deposit of the duplicate payment from the ACOE into the PZ account.

The evidence, when viewed in the light most favorable to the government, indicates that Nolan's administrative assistant, Sheila Carter, notified Nolan of the ACOE's error in forwarding the duplicate payment. Shortly thereafter, Miguel Michelena, the computer assistant, raised the issue again with Nolan. As he had

told Carter initially, Nolan told Michelena to deposit the money into the PZ account and that they would worry about the error if the ACOE discovered it.

This evidence supports an inference that when the money was deposited in the PZ account, Nolan had control over the money as if he had robbed the government and "placed the proceeds of the robbery into his own account with the intent to use the money for his own purposes." Gregg, 179 F.3d at 1315 (holding that a bank fraud was a completed crime when the defendant "fraudulently obtained the deposit of the proceeds of [a] check into his account, with the intent at that time to eventually withdraw the money from the account for his own use"). Unlike the account in Gregg, the PZ account was not technically Nolan's account. However, we find this to be a distinction without a material difference. Nolan's ability to withdraw the money from the PZ account and deposit it in the Renaissance account shows that he had control over the PZ account as if it was his own. Because we conclude that the theft offense was complete when the $345,970 was deposited in the PZ account pursuant to Nolan's command, we find that there was sufficient evidence to support Nolan's conviction for the separate money laundering offense when Nolan withdrew the money from the PZ account and deposited it into the Renaissance account.

## IV.  CONCLUSION

12

We conclude that the district court did not err in instructing the jury on the major fraud charges. Also, there was sufficient evidence presented to support Nolan's conviction for money laundering.

**AFFIRMED.**